**PARTIALLY FILED UNDER SEAL (CONTAINS REDACTIONS)**
***(SEE* ACCOMPANYING MOTION TO SEAL)**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

MILES ZACKERY-COLE NOVEMBER and

KIM POWELL, Guardian, Conservator,
and Attorney-in-Fact for and on behalf of
MILES ZACKERY-COLE NOVEMBER,

        Plaintiffs,

v.

CHESTERFIELD COUNTY, VIRGINIA,

    Serve:

    Jeffrey L. Mincks, County Attorney
    Lane B. Ramsey Administration Building
    5th Floor, Room 503
    9901 Lori Road
    Chesterfield, VA  23832-0040

THIERRY G. DUPUIS,

    Serve at:

    Chesterfield County Police Department
    10001 Iron Bridge Road
    Chesterfield, VA  23832

RYAN T. SWOPE,

    Serve Defendant Swope's counsel:

    David P. Corrigan, Esq.
    Harman, Claytor, Corrigan & Wellman, P.C.
    4951 Lake Brook Drive, Suite 100
    Glen Allen, VA  23060-9272

KEVIN P. GRUARIN,

Case:   **3:17CV113**

**JURY TRIAL DEMANDED**

DAVID M. COLVIN,

APRIL L. LOVING,

SHAWN WILSON,

JAMES R. LAMB, and

      <u>Serve the foregoing at</u>:

      Chesterfield County Police Department
      10001 Iron Bridge Road
      Chesterfield, VA  23832

JON H. MOSS,

      <u>Serve at</u>:

      4913 Fitzhugh Avenue
      Richmond, VA  23230

            Defendants.

## <u>COMPLAINT</u>

COME NOW the Plaintiffs, Miles Zackery-Cole November and Kim Powell, Guardian, Conservator, and Attorney-in-Fact for and on behalf of Miles Zackery-Cole November, by counsel, and move this Court for judgment against the Defendants Chesterfield County, Virginia ("Chesterfield County"); Thierry G. Dupuis; Ryan T. Swope; Kevin P. Gruarin; April L. Loving; David M. Colvin; Shawn Wilson; James R. Lamb; and Jon H. Moss, in this Complaint on the grounds and in the amounts as follows:

## I.     <u>INTRODUCTION</u>

1.     Late on the evening of February 7, 2015 and/or early on the morning of February 8, 2015, near the intersection of Jefferson Davis Highway and Chester Road in Chesterfield County, Virginia, then 26-year-old Miles November was involved in a serious one-car collision

after fleeing a police traffic stop.   The vehicle that November was driving rolled numerous times, spewing gasoline in the process, crashed, and came to rest on its roof.

2.        Officers arriving on the scene smelled the strong odor of gasoline.  They also saw gasoline leaking from the vehicle.  One officer said that "fluids were pouring from the overturned vehicle."  Fluid was observed dripping inside the car.  Concerned that a fire could soon erupt, the officers decided to remove November from the wreckage prior to paramedics arriving.  The officers dragged November from the wreckage and placed him on his back in the roadway.  One officer estimated the distance that November was dragged to be as short as 20 feet from the wreck.  Because November was in custody, compliant and clearly injured, he was not handcuffed by officers.  November was not armed in any way.  Furthermore, the officers knew that November was not armed in any way.

3.        Ryan T. Swope, then a police officer with the Chesterfield County Police Department ("CCPD"), arrived at the crash site as officers were pulling November from the wreckage.  Swope observed Officers Colvin and Wilson dragging November away from the wreckage and placing him down in the roadway on his back.  Swope had just returned to CCPD five weeks earlier after having been disciplined for multiple incidents of misconduct.  When Swope returned to the force, he was placed on disciplinary probation for one year.  Upon observing the scene, Swope radioed the police/emergency dispatcher, "I'm gonna need fire out here.  Fluid is leaking.  It's leaking fuel." The dispatcher asked how much fuel was leaking.  Swope replied, **"a lot."**  (Emphasis added.)

4.        Soon thereafter, Chesterfield Fire Engine 17 pulled up to the crash site and the fire captain observed from the engine's cab "[Police Department] officers … standing around [November] who was on the road…"

5.     Engine 17 and Medical 17 pulled up in the roadway behind November as he was lying in the road.  The sound of the two large vehicles and their sirens, along with their headlights and flashing lights – all behind and above November (as he lay on the roadway on his back) – startled November.  After first lying still, November began to move about in an apparent effort to stand up.  Some officers said that November was swinging his arms around.

6.     When November began to move, the four heavily armed officers standing over November "swarmed" on him – the characterization of one of the officers.  Multiple officers grabbed November's arms and otherwise restrained him.  Gruarin, a competitive weightlifter, began punching November in the face and head; he landed multiple blows.  Attached as **Exhibit 1** is a photo of Gruarin deadlifting over 500 lbs.

7.     Upon hearing "yelling," Swope moved from the wreckage that was leaking "a lot" of fuel to the "swarm" of officers.  Swope has stated that he never saw November contact any of the officers who surrounded and then swarmed on November.  Swope unholstered his Conducted Electrical Weapon (CEW) (principally referred to herein as a taser gun or taser) and then shouted to the officers "taser, taser, taser."  The four officers all realized what Swope intended to do.  Indeed, at least one of the officers repeated the phrase.  The officers released their grips on November and moved away from him as fast as they could.

8.     Swope then intentionally fired the two probes of his 50,000-volt Taser X2 CEW at November.  He had not given any warning, order, or opportunity to comply to November of any kind before firing his taser.  The electrical charge from Swope's taser immediately ignited flammable substances and/or vapors on and around November's body and clothing, causing November to become completely engulfed in a fireball.  The fire captain seated in the cab of

Engine 17 reported seeing the "subject on the ground suddenly burst into flame." A lieutenant said that the flames went higher than the height of the fire truck.

9.      The fire that engulfed November burned for at least 30 seconds or more before firefighters extinguished the blaze.

10.     As noted above, Swope and the four officers who surrounded November – officers Gruarin, Colvin, Loving, and Wilson – knew that gasoline, as described by Gruarin, was "all over the place" – "all over the road, all over the car, all over [November]." However, no officer warned or instructed Swope not to fire his taser.

11.     Chesterfield County, Dupuis, and Lamb knew that Swope had, in the past, refused to follow a superior's directive and exhibited unchecked, aggressive behavior. Nevertheless, Swope was permitted to serve as an armed patrol officer in Chesterfield County. In December 2014, Swope received five days leave without pay, a letter of reprimand, a re-assignment out of the canine unit, and one year of probation as a result of two instances: (1) his off-duty confrontation with a Richmond police officer, and (2) his refusal to leash his police dog after having been ordered by a superior officer to do so, which action resulted in another officer being attacked by the dog and suffering injuries. Less than two months later, Swope fired his Taser X2 CEW at November, setting him ablaze.

12.     Records also document that Swope tased suspects more frequently than almost all other officers in CCPD – a rate of approximately four times more frequently than most officers. Also, records show, among other things, that CCPD officers had previously tased suspects who, after fleeing police, were in the grasp of multiple officers – exactly the same circumstances as the instant case, and highly indicative of unconstitutional, retaliatory conduct undertaken to "teach a suspect a lesson" for fleeing police. Indeed, at least one of the officers who "swarmed"

on November conceded that November's actions did not warrant the use of a taser and/or that that officer never considered the use of a taser on November. Records also reveal numerous instances of improper, or, at a minimum, highly questionable uses of tasers by CCPD officers, including tasing handcuffed suspects, multiple tasings of single suspects by multiple officers, tasing of suspects when the arresting officers were merely dissatisfied with the pace of the suspects' compliance, and tasing of unarmed, mentally ill persons. Swope himself admitted to being instructed by a senior officer to tase a handcuffed suspect in retaliation for the suspect's conduct.

13.     In connection with the 136 taser deployments by CCPD officers in the years 2012 through 2015, and despite the foregoing improper/highly questionable uses of tasers, no officer had ever been disciplined, in any way, in connection with the use of his/her taser.

14.     Following an official review of Swope's tasing of November, Chesterfield County and its policymaker Dupuis determined that Swope and the other officers at the scene *fully complied with CCPD's use of force policy*. Despite Swope's clear awareness of gasoline throughout the crash scene – again, Swope reported "a lot" of fuel leaking from the flipped vehicle – and other circumstances negating the use of the taser, Chesterfield County and Dupuis found that CCPD policies authorized Swope to use his taser in the manner he did and under the circumstances involved. This finding is consistent with the customs, policies, and practices that had been established and implemented Department-wide as shown by both by the written policies, the training, and the uses of taser actually made in the field and approved by supervisory officials over a period of years. Specifically, Chesterfield County and Chief Dupuis dubiously concluded that Swope did not "know" that he was in the "presence" of gasoline and gas vapors. The finding underscores that CCPD's taser use of force policy violates the U.S.

Constitution's protections against excessive force by the police.  Notably, CCPD's taser use of force policy does not proscribe the use of tasers when the officer knew, *or reasonably should have suspected, given the totality of the circumstances*, of the presence of combustible vapors or liquids or other flammable substances.  Also, Swope has stated that he viewed CCPD's taser policy as merely suggestive.

15.     The determination that Swope and the other officers complied with CCPD's use of force policy also calls into doubt the credibility of CCPD's determinations that all other 135 taser deployments by CCPD officers from 2012 to 2015 also met policy and constitutional requirements.  The tasing of November, along with the unchecked deployment by Swope and other CCPD officers of tasers in circumstances not warranting the use of a taser, indicates that Chesterfield County and its policy maker, Chief Dupuis, undertook an "official policy or custom" that caused the unconstitutional deprivation of November's rights.

16.     Additionally, Swope should not have been serving as an armed police officer in February 2015 because, during that time and at other times, he was unfit for duty.  His defiant, impulsive, rash, hair-triggered behavior, which was exemplified in the 2013 and 2014 events that led to discipline, is verified by admissions made by Swope in a post-employment workers' compensation claim.  In his own workers' compensation claim, Swope frankly admits that from about 2013 through 2015, ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████ but Swope, upon information and belief, may not have been

forthcoming concerning ████████ in a department-ordered "fit for duty" evaluation, and

Moss failed to conduct an adequate evaluation and investigation of Swope that, if performed

adequately, would likely have revealed Swope's ████████ and unfitness for duty.

17.     As detailed throughout this Complaint, the Defendants acted with deliberate

indifference to November's circumstances and health.  As a direct and proximate result of the

actions of Swope and the other Defendants described above and herein, November suffered full

thickness burns on approximately 86 percent of his body.  To date, he has undergone at least 34

surgeries and has been hospitalized at least 267 days.  His medical bills currently exceed $6.5

million.  He is horribly scarred and disfigured and constantly in pain.

**II.     JURISDICTION**

18.     Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S.

Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343.  Further, this Court has

supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 (a), over the state law claims.  All relief

available under the foregoing statutes is sought herein by Plaintiffs.

**III.    VENUE**

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the acts and omissions

giving rise to Plaintiffs' claims occurred in this district.

8

20.    Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because all, or a substantial part, of the acts and omissions giving rise to Plaintiffs' claims occurred in this division.

## IV.    PARTIES

21.    On August 3, 2015, the Circuit Court of the City of Richmond appointed Plaintiff KIM POWELL as Guardian, Conservator, and Attorney-in-Fact for and on behalf of MILES ZACKERY-COLE NOVEMBER.  Plaintiff Powell brings this action in that capacity. Plaintiff Powell is November's mother.  Still greatly impeded by his injuries, but determined to participate in the litigation that will substantially impact his future, MILES ZACKERY-COLE NOVEMBER joins Powell as a Co-Plaintiff in this matter.  Plaintiffs Powell and November are, and at all relevant times, were, citizens of the Commonwealth of Virginia.  Both Plaintiffs Powell and November reside in Mechanicsville, Virginia.

22.    Defendant CHESTERFIELD COUNTY, VIRGINIA is a county in the Commonwealth of Virginia.  Final decision making authority for Chesterfield County's policies concerning CCPD use of force policies; taser training, use, supervision, control, and related discipline; as well as the broader subjects of officer hiring, training, supervision, discipline, and retention has been delegated to its Chief of Police, who, during the relevant period, was Defendant Dupuis.  CCPD is a department within Defendant Chesterfield County.

23.    Defendant THIERRY G. DUPUIS is, and was, at all relevant times, the Chief of Police of CCPD acting within the course and scope of his employment and under color of state law.  Dupuis is sued in his individual, official, and supervisory capacities.  Dupuis is, and at all relevant times was, an adult resident of the Commonwealth of Virginia.  At all relevant times, Dupuis was aware of, among other things: all CCPD firing of tasers during the years 2012-2015

(via reporting); the events resulting in Swope's 2014 disciplinary sanctions, including his dismissal from the canine unit; the contention of ███████████████████████████ ████████████████████████████████████████████████████; and the events of February 7-8, 2015 resulting in November's severe burns.  Defendant Dupuis personally made and/or ratified the determination that Swope's tasing of unarmed and clearly injured November, resulting in his disfiguring injuries, complied with CCPD's use of force policy.

24.     At all relevant times, Defendant RYAN T. SWOPE was a police officer with CCPD acting within the course and scope of his employment and under color of state law.  In September 2015, Dupuis dismissed Swope from CCPD.  Dupuis has testified that he did so because of Swope's association with an "outlaw motorcycle gang."  Dupuis testified that he did not know for how long Swope had been affiliated with the prohibited criminal enterprise, and, more specifically, that he did not know if Swope's association preceded November's tasing. Swope is sued in his individual capacity.  Swope is, and at all relevant times was, an adult resident of the Commonwealth of Virginia.  Upon arriving at the November single-car crash scene, Swope reported to a police dispatcher that he saw "a lot" of "fuel" leaking from the overturned car.

25.     At all relevant times, Defendant KEVIN P. GRUARIN was a police officer with CCPD acting within the course and scope of his employment and under color of state law. Gruarin is sued in his individual capacity.  Gruarin is, and at all relevant times was, an adult resident of the Commonwealth of Virginia.  Upon arriving at the crash scene, Gruarin observed that "we could smell a strong odor of gas."  Gruarin said that gas was "all over the place."  More specifically, he said that gas was "all over the road, all over the car, all over [November]."

26.     At all relevant times, Defendant DAVID M. COLVIN was a police officer with CCPD acting within the course and scope of his employment and under color of state law. Colvin is sued in his individual capacity.  Colvin is, and at all relevant times was, an adult resident of the Commonwealth of Virginia.  As to the crash scene, Colvin said that "the vehicle was smoking, and we all could smell gasoline." According to Defendant Gruarin, November was removed by officers from the car out of fear of a fire as "Officer Colvin noticed that November was covered in gas."

27.     At all relevant times, Defendant APRIL L. LOVING was a police officer with CCPD acting within the course and scope of her employment and under color of state law. Loving is sued in her individual capacity.  Loving is, and at all relevant times was, an adult resident of the Commonwealth of Virginia.  According to Defendant Loving, "[a]s soon as I approached the vehicle, I could smell the strong odor of gasoline…"; Defendant Loving also noticed that the crashed vehicle was "dripping with gas…."

28.     At all relevant times, Defendant SHAWN WILSON was a police officer with CCPD acting within the course and scope of his employment and under color of state law. Wilson is sued in his individual capacity. Wilson is, and at all relevant times was, an adult resident of the Commonwealth of Virginia.  According to Wilson, "[w]hen I approached the vehicle I could smell a strong odor of gasoline and could see that fluids were pouring from the overturned vehicle."

29.     At all relevant times, Defendant JAMES R. LAMB was a police officer with CCPD acting within the course and scope of his employment and under color of state law. Lamb is sued in his individual and supervisory capacities. Lamb is, and at all relevant times was, an adult resident of the Commonwealth of Virginia. Lamb served as Defendant Swope's supervisor

during the relevant times, including on February 7-8, 2015; he monitored radio traffic of the car chase and then proceeded to the scene of the crash.  At all relevant times, Defendant Lamb knew or should have known of Swope's unfitness for duty as a patrol officer.  Lamb's failure to impose sufficient remedial measure facilitated Swope's precipitous conduct and November's severe burns.

30.     At all relevant times, Defendant JON H. MOSS, Ph.D. was a psychologist practicing in Henrico County, Virginia.  For many years, Moss had been retained by CCPD to conduct officer "fit for duty" evaluations.  According to Defendant Dupuis, Moss had never determined a CCPD officer to not be fit for duty.  Moss knew, or had reason to know, that Chesterfield County, CCPD, the Chief of Police, and/or Swope's superiors in CCPD would rely on Moss's evaluation, recommendations, and advice as to whether Swope was fit for duty.  Moss breached the applicable standard of care when he found Swope fit for duty in December 2014.  There was ample evidence calling into question the accuracy of that determination.  The admissions contained in Swope's workers' compensation claim alone refute Moss's findings.  Upon information and belief, at all relevant times, Moss was acting as an independent contractor, or, alternatively, as an employee of CCPD acting within the course and scope of his employment.  At all relevant times, Moss was acting under color of state law.  Moss is sued in his individual capacity.  Moss is, and, at all relevant times was, an adult resident of the Commonwealth of Virginia.

**VI.   <u>FACTS</u>**

31.     Late on the evening of February 7, 2015 and/or early on the morning of February 8, 2015, Gruarin, a CCPD officer, reportedly observed a northbound 2012 Volkswagen CC sedan cross the dotted and the shoulder lines multiple times on Jefferson Davis Highway (Route 1) in

Chesterfield County, Virginia.  The Volkswagen was being driven by November.  No one else was in the Volkswagen.  The weather was clear and dry.

32.     Gruarin conducted a traffic stop of the Volkswagen at "2354 hours."

33.     Loving, also a CCPD officer, proceeded to the traffic stop to assist Gruarin.

34.     Gruarin walked up to the stopped vehicle and asked November how much he had been drinking.  At that point, November allegedly sped away from the traffic stop.

35.     Loving was driving southbound on Jefferson Davis Highway and saw November drive away from the traffic stop and Gruarin hurriedly return to his police cruiser.

36.     November did a u-turn on Jefferson Davis Highway – he was then heading south on Jefferson Davis Highway – the same direction that Loving was traveling.  November entered the southbound lanes immediately in front of Loving.  Loving asserts that she had to brake hard to avoid a collision with November's vehicle.

37.     Loving, followed by Gruarin, gave chase.  Other officers, hearing the radio traffic of the chase, also responded.  According to Loving, November's top speed reached in excess of 100 miles per hour.

38.     Documents and statements of witnesses indicate that the chase covered 1/10[th] of a mile to 1 mile.  No other civilian vehicles were involved in the chase besides November's.

39.     According to Loving, near the intersection of Jefferson Davis Highway and Chester Road, November's vehicle swerved to the left and struck what appeared to be a sign.  The 2012 Volkswagen that November was driving then swerved to the right and hit a guardrail.  The car then swerved again, and, in Loving's words, "all of a sudden" rolled, side-over-side, approximately six times before coming to rest on its top.  Loving recounted that the crash left

debris and dust "everywhere."   Attached as **Exhibits 2-7** are photographs taken of the wreckage of the car at the scene of the crash.

40.     Gasoline sprayed from the vehicle during the crash.  When Gruarin and Loving pulled up on the scene, followed by officers Colvin (and, later, Wilson) they "all" could smell a strong odor of gas.

        a.      In an interview following the crash, Gruarin told CCPD investigators that there was gasoline "all over the road and the vehicle was smoking."

        b.      Colvin confirmed Gruarin's observations, stating "the vehicle was smoking, and we all could smell gasoline."

        c.      In her report, Loving wrote, "[a]s soon as I approached the vehicle, I could smell the strong odor of gasoline…" and that she noticed that the crashed vehicle was "dripping with gas…."

        d.      Wilson has written, "[w]hen I approached the vehicle I could smell a strong odor of gasoline and could see that fluids were pouring from the overturned vehicle."

41.     Gruarin, Loving, and Colvin found November lying on the inside roof of his overturned vehicle.  When Gruarin, Loving, and Colvin initially approached the wreckage, November appeared to be unconscious, indicating that he had sustained a concussion.

42.     Because of the severity of the wreckage, the officers were unable to open the first car door that they tried.

43.     Standing at the opposite side of the car wreckage, Colvin noticed that November was "covered in gas" and conveyed that fact to the other officers at the scene.[1]  Colvin sought to

---

[1]      Gruarin recorded in his report, "Officer Colvin noticed that November was covered in gas….".

break the window on the other side of the vehicle.  He was unable to break the window, but found that "without much force" he was able to open the door on that side of the vehicle.

44.     Gruarin and Loving joined Colvin on the other side of the vehicle.  According to Gruarin, the three "noticed there was gas leaking everywhere."

45.     At that point, the three officers report that November was now more alert.  He told officers that his back was hurting.

46.     According to Loving, "[w]e advised the driver that the vehicle was leaking fluids and we had to get him out of the car."  November likewise wanted to get out of the wreckage.  At this point, Officer Wilson "showed up."

47.     Believing that, due to the obvious presence of gasoline, an explosion or fire was imminent or posed a significant danger, Officers Colvin, Wilson, and Gruarin extricated the gas-soaked November from the wreckage.  Gruarin observed, "[w]e all just grabbed him, dragged him out of the vehicle…."

48.     Swope, then a CCPD officer, arrived at the crash scene as Colvin, Wilson and Gruarin were pulling November from the wreckage.

49.     Swope has written that the vehicle was "overturned and leaking fluid."

50.     Swope observed Colvin and Wilson drag November away from the wreckage and place him on the roadway on his back.

51.     Loving has written, "[t]he driver wanted to get up but was advised that he was in a traumatic accident and it was best that he didn't move."

52.     Colvin has written, "[a]t this point the driver wanted to stand, but because of the unknown injury to the driver's neck or back, I restrained him.  I placed my hands on the inside of each of his wrist and forced them to the pavement asking him to relax and lay on his back."

53.     Colvin has written that November lay in the roadway "approximately 20 feet from the vehicle …"  Gruarin estimated that November was dragged 20 yards from the smoldering vehicle.  A CCPD supervisor who arrived on the scene estimated the same distance to be "about 15 yards."

54.     As four officers stood or kneeled around November, Swope assessed the full crash site "to see if anyone had been ejected from the wrecked vehicle."  Swope asserts that he then removed large pieces of crash debris from the travel lanes.

55.     According to Swope, he then re-approached the wrecked vehicle and observed "fluids" "leaking from the wrecked vehicle onto the pavement."  At some time after his arrival on the scene, Swope reported to the police/emergency dispatcher through radio transmission that "I'm gonna need fire out here.  Fluid is leaking.  It's leaking fuel." The dispatcher asked how much fuel was leaking.  Swope replied, "a lot."

56.     As noted above, when November was initially laid in the roadway, he was generally still.  Colvin writes in his report, "I was kneeling at his head, so my right arm would have been restraining his right arm and my left his left.  The driver continued to attempt to get up, but was easily restrained."

57.     Gruarin, Wilson, Loving, and possibly other officers, stood over November.  As noted above, Colvin kneeled over him.

58.     When Chesterfield Fire & EMS Engine 17, measuring 9 ½ feet tall and weighing 42,000 lbs., arrived on the scene along with Medical 17, however, November apparently became startled by the arrival and noise of the vehicles – the engine that pulled up behind November towered over him, and, upon information and belief, bathed him in both its headlights and flashing lights.

59.     The officers at the scene uniformly point to the arrival of the fire and medic vehicles as the event that spurred a sudden change in November's behavior.

a.     According to Colvin, "[o]nce the fire truck arrived on scene it parked just behind me.  At that point he became very combative."

b.     According to Loving, "[a]s soon as the fire department arrived, the driver became very combative and irate.  He was trying to stand up and was swinging his arms around."

c.     Wilson observed an increase in agitation in November as he lay on the ground, stating, "just as the fire department arrived on the scene the driver became very aggressive and began to swing his arms wildly and try to stand up."

60.     In response, the group of four officers (Gruarin, Colvin, Wilson, and Loving), in the words of Wilson, "swarmed" on November.  Gruarin reports, "we all jumped on him."

a.     According to Loving, "I gave him verbal commands to stop resisting and that he needs to relax so that rescue can look at him[.]  The driver continued to not listen to our commands and continue to be combative.  I tried to grab one of his arms to detain him but I was unable to get a good grip because he kept pulling his hands away."

b.     According to Wilson, "I gave the driver verbal commands to stop resisting…." With both of his hands, Wilson "grabbed [November's] left arm to try to restrain him from swinging at myself and other officers that were assisting."  Wilson noticed that the sleeve of November's shirt was wet.  It was a dry evening, so the wetness of November's shirt was attributable to gasoline.  According to Wilson, the driver continued to "swing his arms and attempt to stand up after being told to stop resisting."

c.     Officer Gruarin, a champion weightlifter in his off-duty time, stated that he jumped on top of, or bent down, and began to beat November about the face and head with his

fists.  Gruarin added, "there's a lot of emotions going on at that time.  Also, just started to know he was covered in gas, and if we're all going to jump on him, we're all going to get covered in gas as well.  And all it takes is a flame to light us all on fire and kill us all."

61.     Gruarin, Colvin, Wilson, and Loving collectively outweighed November by at least 550 lbs., and, as described above, were standing or kneeling over him as he lay on the ground.

62.     Gruarin, Colvin, Wilson, and Loving were heavily armed.  They each carried a firearm, an asp (a baton that extends upon a sharp flick of the wrist), pepper spray, and a taser. Upon information and belief, they all also wore protective armor under their uniform shirts.

63.     November was undoubtedly still disoriented from the concussion sustained in the crash, was completely *unarmed,* and was injured to a degree that was not known at the time, having previously been unconscious and thereafter complaining of back pain.   At the time, November was relatively skinny.  He weighed approximately 170 lbs. and was 6' 1" tall.

64.     As Swope "moved about the vehicle" (with leaking fluids), he "heard yelling."

65.     In his own words, Swope "moved quickly over" to the swarm "to assist" and "retrieved his taser from its holster."  Officer Swope stood approximately 5 feet from November.

66.     According to Colvin, "[t]he driver was rolled over on his side facing Southbound Jeff Davis Hwy…."

67.     At this point, Swope yelled, "taser, taser, taser" and pointed the lasers emitted by the 50,000-volt taser gun at November's back and below his belt line.

68.     Swope has stated that he yelled, "taser, taser, taser" "in order to **let the officers know** of his intention to deploy the taser."  (Emphasis added.)  **Swope provided <u>no</u> warning to**

**November of what he was about to do, nor any order or chance to comply to avoid the imminent taser firing.**

69.     At this point, Gruarin, Colvin, Wilson, and Loving recognized the danger to themselves of the Taser Conducted Electrical Weapon, and, as a result of the foregoing understanding, released their grasp of November, and quickly distanced themselves from November without providing any instruction or warning to Swope or November, or otherwise seeking to prevent what was about to occur.

70.     Colvin acknowledged Swope's intention, saying, "taser taser" himself before letting go of November.  The three others also made statements indicating a clear understanding of Swope's intention:

a.     Loving stated that she "immediately noticed the two lights from the laser on the driver's rear near his left side and I along with the other officer's immediately stepped back."

b.     Wilson said that he "noticed the two dots from the laser on the driver's lower back area.  I and the assisting officers then immediately stood back…."

c.     Upon hearing "taser, taser, taser," Gruarin "was like, Oh shoot, I better get out of the way.  So I just stepped back…"  Gruarin observed "[a]ll officers then backed off of November."

71.     As noted above, Swope clearly knew that there were gasoline and gas fumes in the area of the crash.  Indeed, Swope had radioed that very critical information to the police dispatcher.

a.     Swope also knew that there were four officers surrounding November, and that November was lying on the ground with the officers above him.  Swope could see in plain

sight, and therefore knew, that none of the other officers had pulled out their tasers, or their asps or pepper spray. Swope knew that none of the officers surrounding November had called out for his help. Swope also knew that November was not armed. The circumstances simply did not necessitate or permit the use of a taser.

       b.     For their part, Gruarin, Loving, Colvin, and Wilson knew and/or stated, among other things, that there was gasoline "all over the road," "all over him, the driver," "we all could smell gasoline," the crashed vehicle was "dripping with gas," and there was a "strong odor of gasoline," "fluids were pouring from the overturned vehicle." Gruarin observed, "the odor of gas was everywhere," and also added that he "could definitely smell it" when he placed his hands on November. Gruarin, Colvin, Loving, and Wilson knew that they had November surrounded, and that they were above him as he lay on the ground. They knew that not a single one of them had pulled out their tasers, or their asps or their pepper spray. They knew that not a single one of them had asked anyone else to pull out a taser, asp or pepper spray.

       c.     Gruarin, Colvin, Loving, and Wilson also knew that not a single one of them had asked for any help from Swope, including physical assistance. Again, November posed no threat necessitating or permitting the use of a taser. CCPD Operational Policy/Procedure 2-3 (effective date June 23, 2014) mandates that the foregoing officers prevent fellow officers from using excessive force, stating, "[I]t is the duty of a police officer to stop another police officer from using excessive force." However, none of these officers- not Gruarin, Colvin, Loving, or Wilson- warned or instructed Swope not to fire his taser at November.

72.     At this point, Swope pulled the trigger of his Taser X2 Conducted Electrical Weapon causing the cartridge doors of the gun to fly open and two barbed probes attached to wires to fire (via compressed nitrogen) from the taser.

73.     The darts pierced November's clothes and skin and lodged in his back and below his belt line.

74.     Upon striking November, an electrical circuit was created and **thousands of volts pulsed through November's body for a pre-set interval of five seconds.  The current "pulsed" at a rate of 19 times per second.**[2]

75.      According to Colvin and Loving, November was immediately "engulfed in flames," and according to Gruarin, "November was covered in flames from head to toe."

76.     Fire Captain Amy Burnette was in the cab of Engine 17 when the engine and firefighters pulled up to the scene of the crash.  In her report of the matter, she writes, "PD officers were standing around the subject who was in the road…"  Her report continues, "[a]s I finished my scene report the subject **on the ground** suddenly burst into flame."  (Emphasis added.)

77.     Fully engulfed in flames, November "got to his feet and started staggering calling for help."

78.     According to Wilson, he and the other officers "then immediately moved away from the area while the driver was on fire."

79.     According to Loving, "[h]e appeared to make his way towards me and he was also running close to the car that was leaking gas.  I moved away from the area …."

---

[2]  The Taser X2 CEW is designed to override the nervous system and take over muscular control. People who have experienced the effect of a CEW typically liken it to a debilitating, full-body seizure, complete with mental disorientation and loss of control over bodily functions.

80.     Gruarin observed that at that point, he and the other officers "[k]ind of backed off."  Gruarin further explains, "I just remember us backing off because there was gas all over the road and his car was right there and he was running toward the car so …."

81.     When Officer Jerry Kennon, Jr. arrived at the scene of the crash he noticed a group of officers about "15 yards to the west of the suspect vehicle."  Shortly thereafter, he saw a fire quickly grow "and noticed the person on fire stand up and walk toward me."

82.     Officer Kennon noticed that the flames had reached the height of the fire unit's ladder truck and that "the suspect was completely engulfed in flames."

83.     In a report of his observations, Officer Kennon notes, "I noticed the police units run by me, two on my right and two on my left.   My initial thought was that the person that I was seeing was a police officer which raised my question, 'Who the fuck is that.'  Officer Loving who was on my right said, 'It's the suspect.'  I responded by telling all of them to calm down and put the fire out."

84.     Colvin initially ran from November and the vehicle "in fear of an explosion."  Colvin then "decided to give him commands to get on the ground and roll instead."  According to Colvin, "[t]he driver rolled on the pavement East towards Jeff Davis.  He was close to the island median.  At some point he was standing on the median and turned to me asking for help."

85.     Upon seeing November on fire, Captain Burnette and another firefighter exited the cab grabbing fire extinguishers.  With the fire extinguishers, the firefighters approached November, who at that point had dropped to the ground and was motionless. The firefighters extinguished the flames.

86.     November had burned for at least half a minute or more.  The electrical lines that ran from the taser gun to the probes that lodged in November's back and below his belt had melted away.

87.     Officer Kennon then "noticed the suspect was white from the fire retardant and his mouth was open."

88.     Personnel from M (Medical) 17 attended to November at the scene.  Firefighters hosed the extinguisher fire repellant off November.  Later, firefighters washed down the scene of the crash; gasoline was found throughout the area.  Finding gasoline on her police cruiser, Loving sought advice from firefighters before starting her vehicle.  The car was hosed down by firefighters.

89.     Paramedics from M17 then transported November to VCU Medical Center, where he was initially treated by Emergency Department physicians.  He was thereafter transferred to the hospital's critical-care burn unit.

90.     Wilson was assigned to go to VCU Medical Center, observe what was happening, and gather evidence.  Wilson saw physicians scrape away dead, burned skin from November's body.  Wilson retrieved from physicians a taser probe that was removed from November's lower back.  The official report of November's tasing falsely stated: "Did the probe(s) penetrate subjects skin?  No."

91.     As a result of the fire ignited by Swope, November suffered horrible full thickness burns on approximately 86 percent of his body.

92.     November fought for his life for months in the critical care burn unit at the VCU Medical Center.  (The VCU Evans-Hayes Burn Center is the only "verified" burn center in Virginia.)  November was hospitalized for more than six months.  His rehabilitation is

continuing.  He has already required medical care costing more than $6.5 million and he will require a lifetime of care.

93.     November's hospital course has included sepsis (blood poisoning due to infection), respiratory insufficiency requiring a tracheotomy (surgery to create a breathing hole in the neck), renal insufficiency (kidney failure), and the constant nearness of death.  For many months, he was completely unable to feed himself, clothe himself, stand up or walk and was even unable, without significant assistance, to sit up in his bed.   Even now, nearly two years after Swope's taser engulfed him in flames, November has limited use of his arms and legs.

94.     Almost his whole body is horribly scarred and disfigured.

95.     During the course of his medical care for these burn injuries, November has undergone at least 34 surgeries, has been hospitalized for 267 days, has been attended to by 109 doctors for a total of 680 doctor visits, has taken or is taking a total of 118 medications, has had at least 437 physical therapy visits, and has had to use 28 assistive medical or therapy devices. Attached at **Exhibits 8** and **9** are two pictures taken of November during his hospitalization.

96.     Due to the burns and the necessary medical treatment, November has suffered and continues to suffer pain which is beyond the imagining of a person who has not endured it.

97.     November's body and life have been altered forever; he has and will always have horrifying permanent scarring, nightmares, flashbacks, and PTSD.  He will require a lifetime of ongoing medical care costing millions of dollars.  He will never work or be able adequately to care for himself.

98.     Swope's use of the taser under the circumstances at the crash site was ultra-hazardous, unjustified, excessive, horribly wrongful, and unconstitutional.  Swope knew, or should have known, and CCPD's training should have adequately warned him, that the use of a

Taser X2 Conducted Electrical Weapon and the delivery of a high-voltage electrical spark to a car crash victim in the vicinity of flammable substances involves extreme danger and a high likelihood of causing serious injury or death.

99.     Swope's firing of his taser at November and the other officers' flight from November, while failing to warn or intervene, was not objectively reasonable and therefore constituted excessive force.  No reasonable officer in the same circumstances would have concluded that a threat existed that justified the use of force that was employed by Swope, Gruarin, Colvin, Loving, and Wilson upon November.

100.    November's danger to the community, the officers, and himself was all connected to his driving of the car.  Following the crash, the thin, disoriented, clearly injured, unarmed November, who was lying on the ground surrounded by four heavily armed police officers posed no threat necessitating the use of a taser, even apart from the significant flammability concerns. In addition to being "unconstitutionally excessive force," the use of force of firing the taser was not proportional to the post-crash risk posed by November.

101.    The circumstances certainly did not warrant the use of a taser – November was unarmed, had just been involved in a very serious car crash, had no way to flee, and was outnumbered by four heavily armed officers who surrounded him from above as he lay on the ground.  Indeed, police investigators questioning Swope noted, "They grab [November] and lock down on him, and he is struggling trying to get up.  Within less than 20 seconds you – you [Swope] come running up deploy your Taser, they let go because they are in close proximity holding his arms.  And they were in the process of restraining him.  They let go when you said Taser, when you deployed your Taser.  But all the officers were asked and said they were not – other than Colvin being hit [which the investigator noted occurred "initially" incident to

November trying to get up], they were not assaulted and they never saw any other officers getting hit or kicked."

102.    A final indication that November's tasing was wholly unnecessary and clearly constituted the application of excessive force are the observations of Gruarin that November's conduct did not warrant/necessitate the use of a taser.

103.    By any measure, Swope's use of his taser under the circumstances, and Gruarin, Colvin, Wilson, and Loving's failure to warn Swope of the fire hazard or otherwise intervene, constitutes excessive force.

### By Defendant Swope's Own Description, He Was Unfit to Serve as a Patrol Officer

104.    At the time Defendant Swope chose to fire his taser at November, he had only recently returned to active duty as a police officer after having been placed on administrative leave and then disciplinary leave from the police department during 2014 as the result of at least two separate incidents since 2013.[3]  In 2014, Swope was involved in two incidents which resulted in disciplinary inquiries – one in which he got into a protracted, aggressive, heated argument with a City of Richmond police officer near the Redskins training site in August of 2014.  In the incident, Swope, off-duty at the time and in the City of Richmond, continually refused to comply with instructions from the Richmond police officer.  In the other incident, Swope refused to obey an order by a senior officer to leash his police dog at a canine training site, resulting in injuries to another officer.  As a result of this second incident, Swope was removed from the K-9 unit.

---

[3]   In addition to the two 2014 incidents described herein, in 2013, Defendant Swope shot and killed a man after a struggle in the course of a traffic stop.  Swope cited the incident in his workers' compensation claim ███████████████████

105.     Defendant Dupuis acknowledged that Defendant Swope's fitness to serve was a material concern when in December 2014, Dupuis placed Swope on "disciplinary probation," which he characterized as a last-chance remedy.  Despite such concerns, Defendants Chesterfield County, Dupuis, and Lamb never imposed any measure to protect the public from Swope.  The imposition of disciplinary probation did nothing to protect the public from Swope's impulsive, aggressive conduct tendencies and the taser with which they armed him.

106.     In the months leading up to when Defendant Swope shot November with a taser on February 7-8, 2015, Swope ████████████████████████████████████████ ████████████████████████████ After being involved in the two incidents that called into great question his fitness to serve as a police officer, ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████  (Swope may have ████████████████ in part to explain his multiple violations of department policies and procedures rather than out of a legitimate effort ███████████) As a result, Defendants Dupuis and CCPD required Swope to undergo a "Fitness for Duty Examination" ("FFD exam").

107.     A workers' compensation claim filed by Defendant Swope ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████



108.    CCPD hired and consulted with Jon Moss, Ph.D., a police psychologist, to conduct the FFD exam of Swope and to report to CCPD as to whether Swope was fit for duty as a patrol officer with the CCPD.  At that time, ████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Defendant Moss determined Swope to be fit for duty.  Moss documented ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████    As noted above, Moss had been conducting FFD for CCPD for years,

and, according to Defendant Dupuis, had amazingly *never* found a CCPD officer not to be fit for

duty.  Approximately five weeks after CCPD and Defendant Dupuis allowed Defendant Swope

to return to active duty on the night shift, Swope acted improperly, hazardously, in haste, and

with complete disregard for the safety of November and others in the area of gas fumes and

spilled gasoline, by improperly firing his taser at November, thereby setting November on fire.

109.   Swope knew or had reason to know that ███████████████████████████

███████████████████████████ having an adverse impact on his ability to make reasonable and

safe decisions and exercise appropriate judgment in carrying out his law enforcement duties.

Nevertheless, he intentionally and voluntarily chose to go back onto active duty as a patrol

officer in late December of 2014 or January of 2015.  Defendant Moss failed to conduct an

adequate evaluation and investigation of Swope, and/or ignored relevant ████████████ and

information evidencing Swope's unfitness for duty.  Indeed, Swope's workers' compensation

claim reveals acute job-impeding ████████████ that never abated.

**Defendant Chesterfield County Undertook an Official Policy or Custom**
**that Caused the Unconstitutional Deprivation of November's Rights**

110.   Defendant Chesterfield County undertook an official "policy or custom" which

caused the unconstitutional deprivation of November's rights.

111.    During the relevant time period, Defendant Dupuis was the policymaker for Chesterfield County concerning the operations of CCPD officers, including, but not limited to, use of force policies; taser training, use, supervision, and related discipline; as well as the broader subjects of officer hiring, training, supervision, discipline, and retention.

112.    Chesterfield County's official policy or custom arose as a result of certain affirmative decisions of Defendant Dupuis, the policymaking official, and/or in certain omissions on the part of Dupuis that manifest deliberate indifference to the rights of citizens.  (Dupuis has asserted that he did not delegate any relevant policymaking duties to any other person.) Moreover, outside of formal decision-making channels, unconstitutional practices developed within CCPD that were so persistent and widespread and so permanent and well-settled as to constitute a custom or usage with the force of law.  Also, in the face of regular, unchecked, and unconstitutional uses of tasers by CCPD officers, Defendants Chesterfield County and Dupuis made an affirmative decision *not* to train officers regarding the constitutional uses of tasers and *not* to discipline officers who used tasers in violation of the U.S. Constitution.

113.    **Deploying a taser is a serious use of force**.  A taser is a weapon that sends up to 50,000 volts of electricity through a victim's body, effectively commandeering the victim's central nervous system, thereby causing temporary paralysis and inflicting *excruciating* pain.

a.      Tasers kill approximately one person a week in the U.S.  Among other things, causing a high electrical charge to flow through a victim's body for a minimum period of five seconds can cause obvious cardiac complications.

b.      A taser gun uses compressed nitrogen to propel a pair of "probes" – aluminum darts tipped with stainless steel barbs connected to the gun by insulated wires – toward the target at a rate of over 160 feet per second.

c.      Upon striking a person, the taser delivers an extremely high voltage electrical charge through the wires and probes and into the person's muscles.

d.      The impact is as powerful as it is swift.  A taser "seizes" the victim in an abrupt and violent manner. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.

e.      Persons tasered lose muscular control and, if standing, may fall, uncontrolled, face first into the pavement. Such falls have shattered teeth and caused facial abrasions, swelling, and scars.

f.      The tasered person also experiences an intense, excruciating pain that radiates throughout the body.  Tasers may burn a victim's flesh.  Beyond the experience of pain, tasers result in disorientation, loss of balance, and weakness, even after the electrical current has ended.  After being tased, a suspect may be dazed, disoriented, and experience vertigo.

g.      Additionally, tasing causes barbed probes to be lodged into the flesh. Such appropriately requires hospitalization so that a doctor can remove the probe with a scalpel, but the CCPD taser instances reviewed in this matter reveal that, generally, officers simply pulled the probes out of victims on their own.

h.      Also, tasers may leave an acute psychological wound.

i.      Although some place tasers into the category of non-lethal force, it is important to note that non-lethal is *not* synonymous with non-excessive.  Courts have held that all force –lethal and non-lethal – must be justified by the need for the *specific* level of force employed.

j.      **Indeed**, the taser intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not. While pepper spray causes

an intense pain and acts upon the target's physiology, the effects of a taser are not limited to the target's eyes or respiratory system.  The pain delivered by a taser is extremely intense and is not localized, external, gradual, or within the victim's control.  A taser inflicts a painful and frightening blow.

k.    Accordingly, for purposes of the Fourth Amendment, the "nature and quality" of the intrusion into the interests of victims is quite severe when tasers are used.  Taser use clearly imposes serious consequences; however, as noted herein, it was subject to no real circumscription by Defendant Chesterfield County and its policy maker Dupuis.  In short, records show that any and every use of tasers by CCPD officers was acceptable to and ratified by Defendants Chesterfield County and Dupuis.

114.    Documents obtained from FOIA requests made to Chesterfield County indicate that during the years 2012-2015, CCPD officers deployed their tasers 136 times.  In contrast, upon information and belief, during the same period, City of Richmond police tased no persons – City of Richmond Police Department has determined not to arm officers with tasers.  92% of the time that CCPD officers fired their tasers at "subjects" during this period, the subjects were completely unarmed.  (Half of the incidents in which the "suspects" were armed involved suicidal subjects.)  In 51 of the 136 taser deployments (approximately 41%), officers described suspects as "resisting passively" or as "passive aggressive."  Stunningly, reports indicate that the same officer who fired his/her taser oftentimes initially "investigated" his/her own use of force incident.

115.    The documents indicate that 11 of CCPD's 430 plus officers accounted for almost 30% of the taser firings during the relevant period.  Five officers accounted for approximately

15% of the taser firings.  **One of those five most prolific users of tasers in CCPD was Defendant Swope.**

116.    Similar to the instant case, Defendant Swope has previously tased a suspect who was on the ground in the custody of other officers.  On August 10, 2014, while Swope was interviewing allegedly intoxicated citizen Enedino Solorzano, Solorzano allegedly approached Swope in a "threatening" way.  Swope extended his arm, making contact with Solorzano's chest, and Solorzano allegedly took a fighting stance.  Swope reportedly performed an "arc test" on his taser to deter Solorzano, but Solorzano allegedly advanced towards him.  Swope deployed his taser and Solorzano was taken to the ground by other officers.  Thereafter, while Solorzano was on the ground and surrounded by other officers, Defendant Swope tased Mr. Solorzano *again* because Solorzano allegedly continued resisting arrest.  Solorzano was described as a Hispanic male, height 5'4'' to 5'6'', and *four* other officers besides Swope were reportedly involved in the incident.  Swope weighs approximately 220 lbs.

117.    Less than two weeks later, and one day after Swope had ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Defendant Swope tased Steven Whitesell, who is listed in the incident report as 5' 7" to 5' 9" tall, on August 22, 2014 while multiple officers were present.  While transporting Whitesell, a CCPD officer stopped the police vehicle because Whitesell allegedly had taken off his seatbelt and slipped his handcuffs to the front.  After other officers arrived to assist, the officers had Whitesell exit the police vehicle, and they attempted to re-handcuff Whitesell behind his back.  Whitesell allegedly resisted, allegedly tensing up to avoid re-handcuffing, and he allegedly made verbal threats towards the officers present.  Defendant Swope tased Whitesell after Whitesell allegedly continued to resist after receiving verbal warnings.  There were

reportedly two other officers involved besides Swope, and a third officer who was an officer witness.  One undated record concerning the incident states, "Swope involved in this case.  **Flagged for Co. Atty.**"  (Emphasis in original).

118.   Records reveal that CCPD officers used tasers in a manner or in circumstances in which taser use was clearly unconstitutional, not advisable, not recommended, or just plain wrong.

119.   For instance, on multiple occasions CCPD officers have tased persons in handcuffs.

a.   On February 27, 2013, CCPD Officer Christopher Hugate responded to an alleged unauthorized use of a motor vehicle call where several other officers were already on the scene (one report indicates there were 9 officers involved; another report indicates approximately 7).  The female, intoxicated subject had been handcuffed after returning to the scene with the motor vehicle she had allegedly used in an unauthorized manner, but was allegedly refusing to walk to the police's vehicle.  It was alleged that, still in handcuffs, the subject sat down on the ground and declined to move, and was yelling at the police officers.  After allegedly warning the subject that he would tase her if she continued to refuse to get up and walk to the police vehicle, Hugate tased the hand-cuffed woman.  Noncompliance with police directives does not create a sufficient basis for taser use.

b.   On December 21, 2014, with another officer present, CCPD Officer Laura Jason "TASED a handcuffed prisoner refusing to get into police vehicle for DUI."  The matter was **"Flagged for Co. Atty."**  (Emphasis in original.)

120.   On nine occasions, multiple officers tased the same subject.  Twenty-one *other persons* (in addition to those nine) were tased multiple times by the same officer.  There may be

circumstances warranting multiple tasings of the same person, but the number of times that such was done and the underlying circumstances strongly call into question whether the multiple tasings were justified, or, instead, were nothing more than officer-imposed punishment.

       a.     On September 14, 2014, CCPD Officers Kyle Tower and Chad Byerly both tased Derrick Banks, a shoplifting suspect who allegedly fled on foot with stolen items after a vehicle stop.

       b.     On October 13, 2015, CCPD officers Melvin Matias and Joel Seamster attempted to arrest Herbert Booth for trespassing.  Booth allegedly refused to put his hands behind his back and allegedly threatened the officers, putting his hands in fists.  After initially being tased, Booth, a black male reportedly between 5'4'' and 5'6'' in height and reportedly believed by officers to be mentally unstable, allegedly fled from the officers.  During the officers' pursuit, Booth allegedly turned around and swung at one of the officers, but missed, and was grabbed and taken to the ground by the officers.  While on the ground, Booth allegedly continued to refuse to put his hands behind his back, and he was tased again.  Both Officers Melvin Matias and Joel Seamster tasered Booth.

121.    CCPD officers tased or attempted to tase juveniles or persons suspected of minor offenses.

       a.     On September 18, 2014, CCPD Officer Michael Comeforo fired his taser at a high school student.  Officer Comeforo was responding to a school radio report that male subjects were entering the wood-line near the football stadium. Officer Comeforo observed students smoking.  The officer noted the identity of all of the students.  He then identified himself.  All but one of the students ran.  While Comeforo was in pursuit, one student allegedly

threw his lighter in the officer's direction and the officer deployed his taser, but missed and did not strike the student.

        b.      On June 15, 2015, CCPD Officer Jared Slusser was assisting another officer to search for a runaway subject who was reportedly hiding in an alley by a shopping center.  The subject allegedly came out from behind a shed and started running away from the officers.  When the subject allegedly did not follow verbal commands to stop running, Slusser deployed his taser twice.  The subject was described as between 5'4'' and 5' 6'' in height, with a small build.  Another record of the tasing described it as "Foot pursuit for non-specified reasons."

      122.    Also, CCPD officers have tased unarmed persons who were known to be mentally ill or otherwise emotionally compromised.  For example, on February 9, 2014, CCPD Officer James Venti responded along with two other officers to a suicidal subject at a hospital emergency room who was allegedly disruptive. The subject allegedly appeared agitated, and was allegedly pacing and staring, breathing heavily and clenching his fists.  When the subject allegedly did not comply with the officer's commands to go back into his room after coming into the hallway, the officer allegedly instructed him to put his hands behind his back; when the subject allegedly did not do so, Venti deployed his taser on the subject.  Thereafter, while the mentally ill subject was handcuffed and surrounded by all three officers, Venti tased the subject again.  Disturbingly, as discussed below, oftentimes the same CCPD officers have carried out tasings on mentally ill persons.

      123.    Further, CCPD officers have tased suspects for no apparent reason.  For example, on November 11, 2013, a CCPD officer was responding to a larceny call.  The officer spotted the suspect, Chaz Sledge, in a convenience store, and called backup since a handgun was reportedly

a stolen item from the alleged larceny.  After backup arrived, a third officer guarded the rear

entrance to the store while the responding officer and Officer Fred Huffman approached the

suspect.  The responding officer displayed his handgun to the suspect.  There was no indication

of resistance by Mr. Sledge, but, nonetheless, Officer Huffman tased Mr. Sledge and then

handcuffed him.  Tasing of a suspect simply for precautionary or retaliatory reasons is

unconstitutional.

124.    CCPD officers have also tased persons after circumstances had de-escalated and a

suspect was on the ground.  For example, on December 28, 2013, CCPD taser instructor Officer

Dan Shuklis was reportedly working extra work at Johnston-Willis Hospital when he

accompanied EMS while they transported a reportedly irate patient to his hospital room.  The

patient, William Saady, allegedly got up and stated he was leaving the hospital, but Officer

Shuklis told him to sit down so he could be examined.  When Saady allegedly refused and

allegedly pushed past Shuklis and began walking away and yelling, Shuklis attempted

unsuccessfully to restrain him.  Saady was allegedly aggressive and did not obey commands, and

"attempted" to punch the officer.  Shuklis tasered Saady with probes.  After Saady had fallen to

the ground, however, Shuklis drive stunned Saady because he was "still somewhat combative."

125.    Of particular relevance to the instant case, CCPD officers tased suspects near

flammables.  On January 17, 2015, less than two weeks before Defendant Swope tased

November, a CCPD Officer tased a suspect in a potentially flammable environment.  Officers

responded to a fire call.  The subject had locked himself in his apartment.  Firefighters forced

entry and exited when the suspect sprayed "something at them."  Officers arrived and the suspect

sprayed them "with the substance" which "appeared" to be "spray paint."  The suspect allegedly

did not comply with orders to get on the ground.  Despite the apparent presence of paint, a flammable substance, the suspect was tased.

126.     Indicative of Defendants Chesterfield County and Dupuis's official policy or custom not to discipline officers who used tasers in variance with the U.S. Constitution, CCPD tasing records show the same officers have been involved in multiple improper or highly questionable tasings.  One of those officers is Defendant Swope.  Others are CCPD Officers Christopher Hugate, Alvin Copeland, Brian Rhodenizer, and Kent Windnagle.

      a.     <u>Officer Hugate</u>

      (1)     *See* the description above of the February 27, 2013 tasing of a woman in custody by CCPD Officer Christopher Hugate.

      (2)     On May 19, 2014, Hugate responded to an allegedly combative subject at Chesterfield Mental Health. The subject was allegedly struggling with two other officers and refusing to take his hand out of his pocket, from which a prescription bottle and cell phone had already allegedly been removed by officers.  Hugate told the subject that Hugate would tase him if he did not comply; he allegedly did not, and was drive-stunned.[5]  There was no evidence that the subject was armed.  With the presence of Hugate, there were three officers on the scene in close proximity to the subject.  Also, the record does not reveal that the subject actually had anything remaining in his pocket when officers searched after the tasing.

---

[5]     Tasers carried by CCCD officers have two modes.  Dart mode, which is applicable in the instant case, fires pointed metal probes into a subject and overrides the central nervous system. According to a Taser International's PowerPoint slide shown to CCPD officers, drive stun mode, does not cause "NMI" (Neuromuscular Incapacitation), but does provide an extremely painful electrical charge to the subject – a technique that the company calls "pain compliance."

b.     Officer Copeland

(1)     On April 28, 2014, CCPD officers attempted to take a subject into emergency custody. The subject allegedly resisted and got into a "fighting stance."  The subject allegedly did not comply with commands when the officers told him to stop resisting or he would be tased. The subject was tased by CCPD Officers Alvin Copeland and William Nelson three times until "full contact" was achieved.  The "Supervisor" of the officers was CCPD Officer Hugate, who is referenced above.  The subject was then transported to a mental health facility.

(2)     On October 28, 2014, Copeland responded to a mentally unstable man at a facility.  After being *handcuffed*, the subject allegedly ran, attempting to escape the mental health building. Officer Copeland tased the mentally ill man.

(3)     On March 8, 2015, CCPD officers Copeland and Hugate responded to a call of a mentally unstable subject /possible overdose. The officers were reportedly told by the subject's family that he had mental health problems and had been to local mental health facility Tuckers several times.  The subject allegedly charged at the officers and was tased *four times* by officers.

c.     Officer Rhodenizer

(1)     On December 5, 2013, Rhodenizer engaged in a vehicle and then foot pursuit of Jamal Walton.  Rhodenizer "deployed" his K-9 and the dog bit the suspect twice – initially in the back/rib cage area, and then on the right hand.  Walton received puncture wounds from the bites.  Rhodenizer then tased Walton "due to non-compliance with verbal commands."

(2)     Then, on December 8, 2015, Rhodenizer responded to a call regarding a mentally unstable subject.  When the subject attempted to run back into his

residence, Rhodenizer tased him.  There is no indication that any instructions were ever provided to the subject, and no indication that he threatened the officers.

          d.     <u>Officer Windnagle</u>

          (1)     On December 11, 2013, Windnagle fired the probes of his taser at Terrance Best, who had allegedly fled in his car and then on foot following a traffic stop.  Best hit the ground following the tasing.  Windnagle then re-tased Best because he had allegedly sat up on his buttocks, which was allegedly not in compliance with commands.

          (2)     On January 6, 2015, Windnagle responded to a reportedly suicidal and mentally unstable subject who dispatchers believed may have been part of a hit and run.  Windnagle was advised by another officer who arrived on the scene first that the subject had taken off on foot and had cut his wrists.  Windnagle came across the mentally ill subject and "immediately" deployed his taser.  The subject allegedly resisted and was tased again.

      127.    Defendant Chesterfield County and its policymaker Defendant Dupuis would have been aware of the improper/unconstitutional tasings by CCPD officers, including the foregoing events, as a CCPD report is prepared every time that a taser is fired.  As noted previously, no CCPD officer has ever been disciplined for the use of his/her taser, including the foregoing instances.

      128.    Further, records show that on numerous occasions, in addition to the instant case, tasers were fired at unarmed suspects who had fled police, but who, immediately before being tased, were on the ground, sometimes in the grasp of multiple officers, or closely similar circumstances.  Those circumstances indicate that the suspects were, or may have been, tased as retaliation, or illegal punishment for the suspect's conduct – specifically running away from officers or otherwise angering officers – rather than for any legitimate law-enforcement purpose.

The U.S. Constitution prohibits the use of force which is excessive, force which is gratuitously administered, and force which is applied for no good reason but to punish.

129.     An example of the prevalence of taser misuse in CCPD and the condoning of that conduct by supervisors can be seen in the formal interview of Swope following his tasing of November.  Swope was being interviewed by Lieutenant Burgess, and in defense of his actions, reminded Burgess that Burgess had advised Swope to tase a suspect who was handcuffed and being held by two officers because the suspect had spat at the officers.  (Swope asserted that he did not do so.)

130.     The foregoing instances of taser uses by CCPD officers during the period from 2012-2015, as well as numerous other instances, also demonstrates that Defendant Chesterfield County and its policy maker Defendant Dupuis were willing to characterize any form of subject/suspect dissonance as "resisting."  It did not matter if the subject was handcuffed, mentally ill, a juvenile, or on the ground unarmed and surrounded by multiple officers.  It did not matter if the officer gave the suspect a warning or not.  By its custom and practice borne out by past taser uses and CCPD ratification of the same, it can be properly asserted that Defendant Chesterfield County effectively encouraged officers to tase suspects in any instance where the suspects' actions could be lumped into the category of "resisting."  As a result, a weapon that commandeers the central nervous system and causes excruciating pain was green lighted for prevalent unconstitutional use.

131.     Further, in the foregoing instances, and on numerous other occasions, CCPD officers hastily defaulted to taser use rather than lesser forms of force, such as pepper spray.  The foregoing instances and the officer Defendants' actions on February 7-8, 2015, demonstrates that it was the custom, policy and practice of CCPD for officers to use tasers readily, freely, hastily,

gratuitously, and without using or considering lesser force alternatives.  The custom, policy and practice was that tasers could be used without constraint, without pause, without warning and an opportunity to comply, and in a hasty and quick manner.  Swope had discovered that the custom and practice at CCPD permitted gratuitous tasing of unarmed injured suspects who were on the ground surrounded by other officers.  Indeed, Defendant Swope insists that he acted within and not outside of CCPD customs and practices.  It also explains why Dupuis and other senior officers never disciplined Swope or the other officers for their conduct on February 7-8, 2015.  These officers knew that what Swope was doing – acting hastily, with an inadequate consideration of alternatives, and with no warning to November – all conformed with CCPD policy.  By their unwillingness to restrain unconstitutional taser uses by CCPD officers, Defendants Chesterfield County and Dupuis facilitated, aided, and abetted Swope's unconstitutional conduct.

132.    Upon information and belief, the internal investigation of each of the 136 deployments of tasers by CCPD officers during the period from 2012-2015 concluded that each and every taser use was authorized and/or permitted by the CCPD customs, policies, and practices regarding taser use.  The lack of any admonitions, supplementary training, cautionary comments, concerning the unwarranted, unconstitutional, and/or improper uses of tasers noted above, underscores that Defendant Dupuis and his entire chain of command were pleased with, and wanted no change from, then present practices.  There can perhaps be no greater indication of the custom, policy, and practice of an organization than when the organization declares an action to have complied with organization rules.  Indeed, that is how custom, policy, and practice is made.

133.     Included among the evidence that Defendant Chesterfield County undertook an "official policy or custom" that caused the unconstitutional deprivation of November's rights, is the County's determination (made by and through its policymaker Defendant Dupuis), after an official review of the matter, *that Swope's near killing of November in the horrific manner described herein* <u>*complied*</u> *with CCPD policies and procedures.*

134.     Further, Defendant Gruarin, Colvin, Loving, and Wilson's actions of releasing November and stepping away from him so that November could be tased by Swope affirms that it had become the custom and practice within CCPD to employ excessive, unwarranted, unconstitutional, and exceedingly dangerous force upon suspects at the will of any officer.  Indeed, no officer yelled "Stop," put up their hands, shielded November, or did anything to prevent the unconstitutional actions of their fellow officer.  By their actions, the four officers manifested their view of what the then current custom and practice was concerning the firing of tasers at suspects – any level of dissonance or combativeness, no matter what the circumstances, including an overwhelming police force surrounding an unarmed suspect – permitted the immediate firing of his taser by any officer.  Indeed, the officers did not file or make any report of any violation of the use of force policy.

### Defendant Chesterfield County Failed to Properly Train Officers in the Use of Tasers

135.     During the relevant period, CCPD utilized "stock" PowerPoint presentations created by the manufacturer of CCPD's Tasers X2 CEWs, Taser International, to initially train, and then annually to retrain, officers regarding the use of tasers.  Taser International's PowerPoint presentations have been subject of heavy criticism over the years.  Recognizing the shortcomings of Taser International's PowerPoint presentations, some jurisdictions have opted to

supplement or supplant Taser International's PowerPoint presentations to better instruct officers. CCPD did not choose to do so.[6]

136.    Defendant Swope received his initial training in the use of the Taser X2 CEW in November 2013.  CCPD's initial taser training was completed in only one day.  Defendant Swope received shorter "re-certification" training in December 2014, which consisted of Swope's independently viewing an online PowerPoint followed by approximately two hours of general use of force training.  Upon information and belief, the other officer Defendants received similar instruction at some time prior to February 7-8, 2015.

137.    Taser International's stock PowerPoint training did inform Swope, Gruarin, Colvin, Wilson, and Loving that the Taser X2 Conducted Electrical Weapon was a dangerous weapon that, in addition to other dangers, could ignite flammable materials.

138.    One slide in the presentation shown to CCPD officers, including the Defendant officers herein, is titled "Flammability" and reads:

TASER CEW can ignite explosive materials, liquids, fumes, gases, vapors, or other flammable substances, gels, and materials

Gasoline, sewer gases, meth labs, flammable personal defense sprays, hair gels, butane lighters, etc.

139.    Another slide states:

Be aware of foreseeable primary risks and risks of secondary injury, especially falls from heights or on hard surfaces, ignition of flammables, ….

140.    The PowerPoint slides used to train CCPD officers concerning flammability dangers were merely informative.  The slides did not provide CCPD officers with the specific directive that the TASER shall not be used when the officer knows or should reasonably suspect,

---

[6]    Excepting "Operational Policy/Procedure 2-29, IV. A. 5., which is discussed below.

given the totality of the circumstances, that combustible vapors or liquids or other flammable substances are present, or words to that effect.

141.    The only written guidance the Defendants and other CCPD officers received regarding the use of tasers in the proximity of flammable substances and vapors was provided in "Operational Policy/Procedure 2-29, IV. A. 5." (effective date November 25, 2013), stating:

> The TASER should not be used in the known presence of combustible vapors or liquids or other flammable substances.

142.    Relying upon 2-29, IV. A. 5., Swope has suggested that CCPD *failed specifically to instruct him not to use the taser in the known presence of combustible vapors or liquids or other flammable substances.*  He asserts that CCPD's instruction concerning the use of a taser in the presence of combustible vapors or liquids or other flammable substances is merely *suggestive* and not mandatory.  (He points to the use of the verb "should.")  Swope's assertion carries the inference that *had he been instructed and/or directed* <u>not</u> to use his taser in the known presence of combustible vapors or liquids or other flammable substances, he would not have tased November on February 7-8, 2015.

143.    CCPD's taser trainer Shuklis contented that the words "should not" in 2-29 meant, in fact, "may in your discretion" be used.  Such a contention essentially concedes that CCPD's use of force policy contained no constitutional circumscription.  CCPD further was aware that officers might regard the "should not" language as merely suggestive; for example, a high-level CCPD official had noted in an email that if CCPD wanted its officers to always summon EMTs anytime a taser is used, CCPD had to use the word "shall" and not "should." The official observed that only when CCPD used the word "shall" did officers understand the instruction to be mandatory.

144.    CCPD's failure to properly train: (a) Defendant Swope not to fire a taser when the officer knows or should reasonably suspect, given the totality of the circumstances, that combustible vapors or liquids or other flammable substances are present, or words to that effect, and (b) the four officers who surrounded November to prevent the inappropriate and unconstitutional deployment of tasers, were proximate causes of November's horrific injuries.

145.    Defendants Swope, Gruarin, Colvin, Loving, and Wilson were clearly aware that gasoline and gas vapors were present throughout the entire crash scene – again, Swope reporting "a lot" of fuel leaking from the flipped vehicle, and Gruarin acknowledging that he also saw November being extricated from the mangled vehicle and dragged through the crash scene, where gasoline was on the ground.  Despite these circumstances and other circumstances negating the use of the taser, including that November was unarmed, on the ground, and surrounded by four heavily armed officers – Defendants Chesterfield County and Chief Dupuis *concluded that Swope complied with CCPD's use of force policy*.  Specifically, Chesterfield County and Chief Dupuis outrageously concluded that Swope did not "know" that he was in the "presence" of gasoline and gas vapors.  This conclusion underscores that CCPD's taser use of force policy violates the U.S. Constitution's protections against excessive force by the police. Notably, CCPD's taser use of force policy does not forbid the use of tasers when the officer knew *or reasonably should have suspected, given the totality of the circumstances,* that the use of the taser would likely cause severe injury or death to suspects, or words to that effect.  The assertions of Defendant Swope and the conclusion of Defendants Chesterfield County and Chief Dupuis demonstrate that the foregoing is not a mere theoretical consideration.

146.    CCPD's chief taser trainer during the relevant period, Officer Daniel Shuklis, said that he provided initial taser trainees two examples regarding circumstances when they might be

46

in the presence of gasoline and gas vapors.  Both examples involved vehicles.  One example was at a gas station.

147.    However, Shuklis said that CCPD's Use of Force policy 2-29, IV. A. 5. ("The TASER should not be used in the known presence of combustible vapors or liquids or other flammable substances") was left wholly to CCPD officers to interpret.  As an example, in a non-deadly force situation, Shuklis stated that he himself tased a suspect at an emergency room despite knowing that oxygen and other flammables were in use.  Shuklis, again CCPD's head taser trainer during the relevant time period, appeared to conclude that the use was acceptable because a fire/explosion did not occur.  He had no understanding whatsoever, and provided no guidance to trainees, as to how far away they needed to be from flammable substances and vapors to safely deploy their tasers.  Luck is, of course, not a means of satisfying constitutional mandates.

148.    Further, indicating the essentially limitless permitted uses of tasers as taught by CCPD and Shuklis, in February 2012, Shuklis himself tased an unarmed suspect who sat on a toilet in a small bathroom, with no means of escape.  The man initially complied with Shuklis's command to stand up and show his hands.  However, Shuklis tased the suspect because the suspect did not immediately exit the bathroom, but requested to first complete going to the bathroom.  The Plaintiffs do not dispute that police officers oftentimes have an especially challenging job, but tasers are extremely dangerous *weapons* – responsible for approximately one death per week in the U.S. – and are not intended as a means of merely speeding compliance with officer orders in a non-deadly force circumstance.  Records show that Shuklis's method of deployment of the potentially death-inducing taser to either punish a suspect or unreasonably

demand immediate compliance with an instruction has been repeated many times by CCPD

officers with the approval and/or ratification of Defendants Dupuis and Chesterfield County.

149.     One slide in Taser International's PowerPoint informed every participant in the

training that they were a "safety officer."  Any participant noticing an unsafe condition was

instructed to call out **"Stop Action!"**  (Double emphasis in the original.)  However, the events of

February 7-8, 2015 described in this Complaint indicate that *one slide* devoted to recognizing the

intended dangerous use of a taser by another officer during training was wholly inadequate.

CCPD officers appeared to receive no hands-on training in recognizing potentially dangerous

taser uses.  This failure to provide such training was a cause of November's horrific injuries.

150.     In addition to providing no clear instruction as to prohibited uses, another obvious

constitutional deficiency of the slides and other instruction provided to CCPD officers is that

officers were never provided a short checklist of dangers or conditions in which a taser should

not be utilized – such as "Flammable, Pregnant, Elderly, Child, etc." – similar to "A-B-C"

(airway, breathing, circulation) for evaluating a medical victim.

151.     A further indication of how poorly CCPD officers were trained in the use of tasers

(and Swope's unfitness for duty), can be seen in the precipitous nature of how Swope deployed

his taser against November.  Shortly after hearing "yelling" from the group of officers, Swope

immediately ran to the group, unholstered his taser, told the other officers what he was about to

do, and then aimed and fired at November.  He provided no warning to November and

circumstances indicate that he took no time to determine what was going on.  Firing a taser

almost immediately upon arriving to a scene before assessing "what is going" on is

unconstitutional.

152.     Finally, the unconstitutional deployment of tasers by CCPD officers has continued following November's severe injuries.  **CCPD has made no changes whatsoever to its taser policies and practices as a result of Swope's tasing of November.**  CCPD's training, or rather its lack of training, regarding tasers remains the same.

a.     On April 29, 2015, a CCPD officer fired taser probes at a subject who was handcuffed and in the back of a police cruiser because he did not move fully into the car.  At the time, officers from both sides of the car were pushing or pulling the subject into the car.  The officers were detaining the subject on an alleged DWI charge.

b.     On two separate occasions in 2015, CCPD officer Sergeant Michael Lasorsa tased mentally ill persons.  The facts related to both circumstances indicate that unconstitutional taser policy and practices have continued unabated.

(1)     First, on September 12, 2015, CCPD officer Sergeant Michael Lasorsa responded to a call about a mentally unstable subject in his car at a parking lot who was reportedly acting erratically.  When Lasorsa arrived on the scene, the subject reportedly had his car parked and was reportedly breathing heavy, was soaking wet, was sweating profusely, and was speaking nonsensically.  Another officer arrived on the scene, and Lasorsa told the subject he was going to be detained.  The two officers each grabbed one of the subject's arms and began putting them behind his back; the subject allegedly began tensing up and pulling away from the officers.  A third officer then arrived on the scene.  The officers decided to take the subject to the ground; the two officers besides Lasorsa took the subject to the ground, also apparently falling to the ground themselves.  While the subject was on the ground with at least one of the three officers surrounding him having hands on the subject, Lasorsa yelled "back away" and "Taser" and fired his taser at the subject hitting him on the right hand and back of the left thigh.  The

subject was then detained and brought to Chippenham Hospital, where he reportedly continued to make nonsensical statements and a doctor reportedly said he was delusional; the subject was reportedly brought to Tuckers Triage thereafter.

     (2)  Then, on November 22, 2015, Sergeant Lasorsa twice tased the same mentally ill subject.  Officers were serving an Emergency Custody Order on Bobby P____.  There were reportedly three other officers on scene besides Lasorsa.  P____ reportedly let the officers into his house and was reportedly calm and talked to one of the officers about football.  P____ reportedly seemed to the officers to be under the influence and had slurred speech and mood swings.  When the officers tried to explain the Emergency Custody Order to P___, he allegedly told officers bluntly that he was not going to go with them.  The officers reportedly told P____ to put his hands behind his back and grabbed his arms.  P____ allegedly locked his hands together and tensed up, and allegedly continued passively resisting officers despite commands.  Reportedly "after ten seconds of resisting," Lasorsa told the officers to back off and fired his taser into P____'s torso and left arm.  Reportedly because the taser firing only made P___'s struck muscles tense up and because he continued to say "nope" to the officers, Lasorsa then struck P____ with his taser again, hitting him in his lower left calf.

### Defendants Swope, Gruarin, Colvin, Wilson, Loving, and Lamb were aware that improper use of a taser implicates fundamental rights

153.  The PowerPoint slides shown to CCPD officers, including Defendants Swope, Gruarin, Colvin, Wilson, Loving, and Lamb, contained a legal section that noted the rights of the citizenry to be free of excessive force from the police and Fourth Amendment and other constitutional implications of deploying a taser.  Accordingly, Defendants Swope, Gruarin, Colvin, Wilson, Loving, and Lamb would have been aware, among other things, that the use of a taser in the instant circumstances violated the Fourth Amendment.

154.    Applicable slides shown to CCPD officers, including Defendants Swope, Gruarin,

Colvin, Wilson, Loving, and Lamb, stated, among other things:

- "[I]n judging whether [officer's] actions were reasonable, we must consider the risk of bodily harm that [officer's] actions posed to [suspect] in light of [suspect's] threat to the public that [officer] was trying to eliminate."

- "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity."

- "**(Generally)** To use CEW in probe mode [firing of skin-penetrative darts as in the instant case] officer must reasonably perceive subject to be:

    o An immediate threat of harm/injury, or
    o Fleeing or flight risk from serious offence crime and the officer is justified in tackling the person."
(Emphasis in original.)

- "The use of a CEW involves the application of force."

- "Court may consider 'the availability of [less injurious] alternative methods of capturing and subduing a suspect."

- "Officer should give a warning before force when appropriate."

- "Graham [v. Connor]'s immediate' vs. 'possible" threat:
    '[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.'…
    <u>ONLY 'Immediate' threats – NOT "possible" threats</u>  (Emphasis in original.)

**Defendants Dupuis and Lamb Knew That Swope Posed a Persuasive
<u>and Unreasonable Risk of Constitutional Injury</u>**

155.    Defendants Dupuis and Lamb supervised Swope during the relevant period of

time.  Also, Swope was under Defendant Lamb's direct supervision on February 7-8, 2015, and

Dupuis and Lamb had personal involvement that was causally connected to November's

constitutional deprivation.   Defendants Dupuis and Lamb had actual or constructive knowledge

that Swope, their subordinate, was engaged in conduct that posed a pervasive and unreasonable

risk of constitutional injury to citizens like November; that Defendants Dupuis and Lamb's

response to this knowledge was so inadequate as to show deliberate indifference to or tacit

authorization of the offensive practices; and that there was an affirmative causal link between

this failure to act by Defendants Dupuis and Lamb and the particular constitutional injury

suffered by November.

156.    Defendants Chesterfield County, Dupuis and Lamb, among others, were also well

aware of the dangers posed by the tasers issued to CCPD officers, including Swope.  Indeed, on

January 2, 2015, Defendant Lamb arrived on the scene after officers under his supervisions had

tased a subject with five taser darts.  The officers reported that following his tasing, the subject,

Michael Perez, "began to flail around and started to breath heavy."  "Michael would not calm his

breathing down at which point he began to vomit. … we had to hold him in a sitting position.  …

Michael was … breathing heavy.  He vomited several more times and then tried to roll around on

the ground as if he was having a seizure."

157.    There is no indication that Defendants Dupuis or Lamb placed any type of

limitations on Defendant Swope whatsoever.  "Disciplinary probation" was a designation that

did not impose any additional supervision upon Swope.  Defendant Swope was dangerous to the

community, other officers and himself, but Defendants Dupuis and Lamb did nothing to protect

those in danger.

### The Defendants Breached Duties

158.    At all relevant times, Defendants Swope, Gruarin, Colvin, Loving, and Wilson

and other officers at the scene of the crash had actual knowledge that the area around the site of

the crash including the pavement around the upside down vehicle through which November was

dragged was covered with spilled gasoline and that gas fumes permeated the area around the

crash site.

159.    Furthermore, the circumstances indicated that the foregoing Defendants also knew that November had or may have had gasoline on his person and/or clothing.  Defendants Swope, Gruarin, Colvin, Loving, and Wilson knew or stated, among other things, that November was trapped in, and then pulled from, an overturned vehicle that was "leaking" "a lot" of fuel, that there was gasoline "all over the road, all over the car, all over him, the driver," "we all could smell gasoline," the crashed vehicle was "dripping with gas….," and there was a "strong odor of gasoline." The Defendants also knew that November was dragged through "fluids" which "were pouring from the overturned vehicle."

160.    The foregoing Defendants also knew that tasers issued to them were powerful, 50,000-volt electrical weapons capable of igniting flammable substances and vapors.  Indeed, the tasers were referred to by CCPD as "Conducted **Electrical** Weapons."  (Emphasis added.) Further, when officers came on duty, they were instructed to test whether their tasers were operational by "arcing" the weapons – causing an observable electrical charge to be omitted from the front of the weapons.  The Defendants herein knew that it would be extremely hazardous and, indeed, potentially deadly, for any spark or electrical charge to ignite November's overturned vehicle, the spilled gasoline in the area of the crash, the gas-soaked suspect in their custody, or the strong gas vapors that all of the officers detected.

161.    Despite such actual knowledge of the extremely hazardous condition that would exist in the event that any of the officers at or around the crash site were to deploy a Conducted Electrical Weapon or otherwise spark or ignite gas or gas vapors at or near the crash site, Defendants Gruarin, Colvin, Loving, and Wilson did not instruct or warn Defendant Swope not to fire his taser, or otherwise act to protect the gas-soaked November from the use of a Conducted Electrical Weapon.  Moreover, Defendant Gruarin's improper and unjustified battery

of November exacerbated and elevated the activities of the "swarm," thereby triggering the improper, unjustified, and deadly over-reaction by Defendant Swope in deploying his taser.

162.    Despite his actual and/or constructive knowledge that: (a) November had gasoline, gasoline vapors, and/or other flammable substances on and/or near his clothes and/or body, and (b) the Conducted Electrical Weapon, when used and activated, creates an electrical charge/sparks that can ignite any gasoline, gasoline vapors and/or flammable substances in the area, Defendant Swope consciously chose to fire the taser at November with willful, wanton, and/or reckless indifference to the high probability that it would cause serious injury or death. Despite knowing the same, Defendants Gruarin, Colvin, Loving, and Wilson failed to admonish Defendant Swope as to the extreme dangers associated with Swope's firing of his Conducted Electrical Weapon at November.  Defendants Gruarin, Colvin, Loving, and Wilson manifested an understanding of Swope's "taser, taser, taser" warning to them by releasing their grasp of November and hurriedly moving away from him in order to protect themselves, thereby abandoning November to deadly fire while November was in their custody.   As noted above, Defendant Colvin further acknowledged Swope's intention when Colvin repeated back the statement "taser, taser" before letting go of November.

163.    At all times relevant to this Complaint, Defendant Swope knew that ██████ ████████████████████████████████ which adversely impacted his ability to carry out his responsibilities as a CCPD officer, including but not limited to ███████████████ ████████████████████████████████████████████████████ ██████████████████ Furthermore, Defendant Swope had knowledge of these ████████████████████████ with his daily conduct, responsibilities, and routines before and through the time of the February 7-8, 2015 taser incident.  Nevertheless,

upon information and belief, Swope voluntarily and intentionally chose not to be forthcoming about ████████████ to Defendants Chesterfield County and Moss, and to return to active patrol duty knowing or having reason to know that his judgment, actions, and reactions in tense, stressful job situations could be impacted by his ████████████ Swope's obligation is similar to the obligations of pilots, truck drivers, surgeons, and others not to participate in their job functions if they know or have reason to know that their abilities may be impaired.  In addition, Defendant Dupuis has testified that CCPD had a written policy requiring police officers to self-report when their ability to perform their jobs was impaired.  Swope recklessly chose not to self-report.

164.    At all times relevant to this Complaint, and upon information and belief, Swope's ████████████████████ were the result of several events in his past, including but not limited to his experiences as a soldier in the Iraq War, in 2013 an incident in which Swope shot and killed a man while carrying out his duties as a Chesterfield County police officer, and in August of 2014 an incident involving a City of Richmond police officer near the Redskins training facility, and as well as stress and anxiety from disciplinary investigations or actions against him by the Police Department arising out of the 2013 and 2014 incidents.  Indeed, in 2015, Swope filed two workers' compensation claims due to ████████████████ ████████████████████████████████ ████████████████████████████████ ████████████

165.    As a result of the wrongdoing of the Defendants, November was admitted on February 8, 2015 to the Evans-Haynes Burn Center at VCU Medical Center and remained hospitalized until October of 2015.

166.    November was 26 years old at the time of his injuries, and the ordinary life-expectancy of a man that age is approximately 50.3 years under Virginia Code § 8.01-419.

167.    The willful, wanton, grossly negligent, reckless, and deliberately indifferent actions and/or omissions by Defendants have proximately caused November to suffer extensive, extreme, ongoing physical and mental pain, anguish, suffering, disfigurement, humiliation, and economic losses.  November will never recover from the scars and impairment to his body and mind.  The causes of action asserted in this Complaint seek judgment for monetary damages in an amount sufficient to provide full and fair compensation for the horrific injuries, past and future medical bills, past and future pain and suffering, anguish, disfigurement, severe emotional distress, attorneys' fees, and all other compensable damages sustained by November.

## VII.    COUNTS

### COUNT I

### GROSS NEGLIGENCE AND WILLFUL AND WANTON NEGLIGENCE
### (Defendant Swope)

168.    Plaintiffs incorporate by reference the preceding allegations of the Complaint.

169.    At all relevant times, Defendant Swope owed November the duty to use at least reasonable care, and under the circumstances owed November the duty to use higher levels of care, for the safety, well-being, and protection of November.

170.    By his conduct, Defendant Swope subjected November to his authority and control and was in a special relationship with November such that he owed November the duty to use at least reasonable care, and under the circumstances owed the duty to use higher levels of care, for the safety, well-being, and protection of November.

171.    Defendant Swope, in violation of the duties he owed, without justification, intentionally, unlawfully, with willful and wanton negligence, and with gross negligence used a

taser to apply a high-voltage electrical shock or shocks to November, knowing or having reason to know that November had just been removed from the wreckage of a badly damaged and inverted automobile that he knew and/or should have known had been leaking gasoline, gas fumes and/or other flammable substances onto and around the body and clothing of November as an accident victim and in and around the immediate area of the automobile wreckage.  Indeed, at all times relevant to this Complaint, Swope had actual knowledge that there was an extensive fuel leak or spill at and around the crash site scene.

172.    Additionally, before Defendant Swope's discharge of the taser and with sufficient time for him to react, Defendant Swope had acquired actual, specific knowledge and warning not to use his taser because of the ultra-hazardous circumstances which included that November had gasoline on or about his body, clothes, and/or the area in which he was lying.  Defendant Swope failed to heed or react to this knowledge and warning and discharged the taser at November anyway, thereby setting him on fire.  Defendant Swope's actions and omissions were unjustifiable, unlawful, tortious, and wrongful, and they constituted gross negligence and willful and wanton conduct that proximately caused the horrific injuries to November.  None of the officers at the scene asked for or needed Defendant Swope's assistance, Defendant Swope had not seen November strike any of the other four officers surrounding November, and none of the other officers used or even pulled out their tasers in response to November's attempt to stand up. Only Defendant Swope without request or provocation chose to use the lethal taser on November even though he also had handcuffs, pepper spray and his own two hands to assist if he had been asked.

173.    Defendant Swope was guilty of wrongful, unlawful, willful and wanton, and grossly negligent conduct in failing to take sufficient measures to protect the safety of

November; in firing his taser; in failing to respond to the fire with sufficient speed and sufficient measures; in failing to douse, extinguish, or put out the gasoline fire in a reasonable and timely fashion; in failing to take other necessary actions to protect November from injury and harm; and in failing to take sufficient measures to prevent or reduce the severity of November's injuries.

174.    Defendant Swope's actions and omissions alleged herein were contrary to accepted customs, usages, and standards for police conduct.

175.    Defendant Swope was further guilty of unlawful, willful and wanton, and grossly negligent conduct in voluntarily placing himself in a position of being exposed to the stress, fatigue, and exertion, and the need to make crucial, timely judgments involving matters of life and death as an active duty police officer, knowing or having reason to know that ████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

176.    Defendant Swope's wrongful actions and omissions as alleged herein were done without the consent of November and without lawful justification or excuse.

177.    As a direct and proximate result of the willfully and wantonly negligent and grossly negligent conduct of Defendant Swope, November sustained serious and permanent bodily injuries; has been and will continue to be prevented from transacting his business and household duties; has suffered and will continue to suffer physical pain and mental anguish; has suffered and will continue to suffer disfigurement, deformity, and associated humiliation and embarrassment; has suffered and will suffer inconvenience; and has incurred and will incur

expenses for medical care and treatment and other expenses necessitated by his injuries including hospital, doctors, medical bills, and other expenses necessary to treat, care for, cure and/or ameliorate his injuries and the pain, anguish, and impairments and conditions resulting from those injuries.

178.    Wherefore, Plaintiffs demand and are entitled to recover judgment against Defendant Swope for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00) plus interest from February 8, 2015 pursuant to § 8.01-382 of the Code of Virginia, (1950), as amended, and costs; and for punitive damages in the amount of THREE HUNDRED FIFTY THOUSAND and NO/100 DOLLARS ($350,000.00).

## COUNT II
## BATTERY
### (Defendant Swope)

179.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

180.    Defendant Swope's actions alleged in the foregoing paragraphs of this Complaint constituted and caused an intentional, unlawful, unwanted and harmful touching (and/or touchings), without legal justification and constituted a battery.

181.    As a direct and proximate result of the battery by Defendant Swope, November sustained the injuries and damages previously alleged in this Complaint.

182.    Wherefore, Plaintiffs demand and are entitled to recover judgment against Defendant Swope for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00) plus interest from February 8, 2015 pursuant to § 8.01-382 of the Code of Virginia, (1950), as amended, and costs; and for punitive damages in the amount of THREE HUNDRED FIFTY THOUSAND and NO/100 DOLLARS ($350,000.00).

## COUNT III

### GROSS NEGLIGENCE AND WILLFUL AND WANTON NEGLIGENCE
### (Defendants Gruarin, Colvin, Loving, and Wilson)

183.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

184.    At all relevant times Defendants Gruarin, Colvin, Loving, and Wilson (for purposes of the Count only the foregoing Defendants are referred to as the "Foregoing Defendants") owed November the duty to use at least reasonable care, and under the circumstances owed the duty to use higher levels of care, for the safety, well-being, and protection of November.

185.    By their conduct each of the Foregoing Defendants subjected November to his or her authority and control and was in a special relationship with November such that he or she owed November the duty to use at least reasonable care, and under the circumstances owed the duty to use higher levels of care, for the safety, well-being, and protection of November.

186.    The Foregoing Defendants, in violation of the duties they owed, without justification, intentionally, unlawfully, with willful and wanton negligence, and with gross negligence allowed Defendant Swope to deploy a Taser to apply a high-voltage electrical shock or shocks to November, knowing or having reason to know that November had just been removed from the wreckage of a badly damaged and inverted automobile that he or she knew and/or should have known had been leaking gasoline, gas fumes and/or other flammable substances onto and around the body and clothing of November as an accident victim in and around the immediate area of the automobile wreckage.  Indeed, at all times relevant to this Complaint, the Foregoing Defendants had actual knowledge that there was an extensive fuel leak or spill at and around the crash site scene through which they had dragged November and that November had gasoline and/or gas fumes on his person or clothing.

187.     Additionally, prior to Defendant Swope's discharge of the Taser, and with sufficient time for Defendant Swope to react, the Foregoing Defendants had acquired actual, specific knowledge and warning about the presence of gasoline or gas fumes on or around November, and knew that the use of a Taser in the immediate vicinity of the gas or fumes would constitute an ultra-hazardous circumstance and danger to November and others near him. Nevertheless, the Foregoing Defendants failed to heed or react to this knowledge and warning and failed to act to protect, warn, or otherwise prevent the discharge of the taser at November, thereby allowing November to be set on fire.  The Foregoing Defendants' actions and omissions were unjustifiable, unlawful, tortious, and wrongful, and they constituted gross negligence and willful and wanton conduct that proximately caused and/or contributed to the horrific injuries to November.

188.     The Foregoing Defendants are guilty of wrongful, unlawful, willful and wanton, and grossly negligent conduct in failing to take sufficient measures to protect the safety of November; in failing to alert or warn other officers, including Defendant Swope, not to use a taser on November or in the vicinity of the extensive fuel spill, and in causing November to become engulfed in flames; in failing to respond to the fire with sufficient speed and sufficient measures; in failing to douse, extinguish, or put out the gasoline fire in a reasonable and timely fashion; in failing to take other necessary actions to protect November from injury and harm; and in failing to take sufficient measures to prevent or reduce the severity of November's injuries.

189.     The Foregoing Defendants' actions and omissions alleged herein were contrary to accepted customs, usages, and standards for police conduct.

190.     The Foregoing Defendants' wrongful actions and omissions, as alleged herein, were done without lawful justification or excuse.

191.    As a direct and proximate result of the willfully and wantonly negligent and grossly negligent conduct of the Foregoing Defendants, November sustained serious and permanent bodily injuries; has been and will continue to be prevented from transacting his business and household duties; has suffered and will continue to suffer physical pain and mental anguish; has suffered and will continue to suffer disfigurement, deformity, and associated humiliation and embarrassment; has suffered and will suffer inconvenience; and has incurred and will incur expenses for medical care and treatment and other expenses necessitated by his injuries including hospital, doctors, medical bills, and other expenses necessary to treat, care for, cure and/or ameliorate his injuries and the pain, anguish, and impairments and conditions resulting from those injuries.

192.    Wherefore, Plaintiffs demand and are entitled to recover judgment against the Foregoing Defendants jointly and severally for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00) plus interest from February 8, 2015 pursuant to § 8.01-382 of the Code of Virginia, (1950), as amended, and costs; and for punitive damages in the amount of THREE HUNDRED FIFTY THOUSAND and NO/100 DOLLARS ($350,000.00).

## COUNT IV
## BATTERY
### (Defendant Gruarin)

193.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

194.    Gruarin's actions alleged in the foregoing paragraphs of this Complaint constituted and caused an intentional, unlawful, unwanted and harmful touching (and/or touchings), without legal justification, and constituted a battery.

195.    As a direct and proximate result of the battery by Gruarin, November sustained the injuries and damages previously alleged in this Complaint.

196.    Wherefore, Plaintiffs demand and are entitled to recover judgment against Gruarin for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00) plus interest from February 8, 2015 pursuant to § 8.01-382 of the Code of Virginia, (1950), as amended, and costs; and for punitive damages in the amount of THREE HUNDRED FIFTY THOUSAND and NO/100 DOLLARS ($350,000.00).

## COUNT V
### BREACH OF ASSUMED DUTIES
**(Defendants Gruarin, Colvin, Loving, and Wilson)**

197.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

198.    At all times relevant to this Complaint, Defendants Gruarin, Colvin, Loving, and Wilson had taken control of and/or custody of November and, therefore, undertook to render services or to conduct themselves in such a way that they should have recognized that it was necessary for them to exercise reasonable care for the protection of November or to refrain from gross negligence in that regard, if

a.    their failure to exercise due care increased the risk of such harm to November, or

b.    they undertook to perform a duty owed by another toward November, or

c.    the harm was suffered because of reliance of November upon the undertaking.

199.    Defendants Gruarin, Colvin, Loving, and Wilson (for purposes of the Count only the foregoing Defendants are referred to as the "Foregoing Defendants") assumed and/or

undertook the following duties to November and, therefore, had a duty to carry out those duties without gross-negligence, without willful and wanton conduct, and non-negligently:

a.      the duty to use reasonable care to protect November while he was in their custody and control from any assault and battery, injury, and physical or mental abuse;

b.      the duty to employ practices that would protect November from assault, injury, assault and battery, abuse and mistreatment at the hands of any CCPD employees, officers, and/or agents;

c.      the duty to follow, adhere to, and employ proper techniques, policies, practices, protocols, and instructions in the appropriate and safe use of tasers, particularly in and around an area where they knew there was an extensive gas spill and the existence of extensive gas fumes; and

d.      the duty to refrain from assault and battery, excessive force, gross negligence and/or willful and wanton conduct in the use of a taser on persons (including November), and/or in the use of excessive force by striking, beating, or hitting November in the face and head as a method of compliance control, knowing or having reason to know that November had just been in a serious automobile collision and could be suffering from head or other injuries.

200.    The Foregoing Defendants knew or reasonably should have known that persons coming into their control and custody, and particularly November, did and would reasonably rely on the Foregoing Defendants to act reasonably and carefully and without gross negligence or willful and wanton conduct in carrying out those duties that were owed and assumed; therefore, the Foregoing Defendants were required to carry out those owed and assumed duties with

prudence and reasonable care under the circumstances and without gross negligence and/or willful and wanton conduct.

201.    The Foregoing Defendants breached their duties and assumed duties to November as alleged in this Complaint, and said <u>breach of those duties unreasonably increased the risk of harm and injury to November,</u> and November suffered permanent and catastrophic harm as a result of his reasonable reliance on the Foregoing Defendants assuming and undertaking to fulfill the aforesaid duties.

202.    As a direct and proximate result of the willfully and wantonly negligent and grossly negligent conduct of the Foregoing Defendants, November sustained serious and permanent bodily injuries; has been and will continue to be prevented from transacting his business and household duties; has suffered and will continue to suffer physical pain and mental anguish; has suffered and will continue to suffer disfigurement, deformity, and associated humiliation and embarrassment; has suffered and will suffer inconvenience; and has incurred and will incur expenses for medical care and treatment and other expenses necessitated by his injuries including hospital, doctors, medical bills, and other expenses necessary to treat, care for, cure and/or ameliorate his injuries and the pain, anguish, and impairments and conditions resulting from those injuries.

203.    Wherefore, Plaintiffs demand and are entitled to recover judgment against the Foregoing Defendants jointly and severally for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00) plus interest from February 8, 2015 pursuant to § 8.01-382 of the Code of Virginia, (1950), as amended, and costs; and for punitive damages in the amount of THREE HUNDRED FIFTY THOUSAND and NO/100 DOLLARS ($350,000.00).

## COUNT VI

### EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983
### AND AMENDMENTS IV AND XIV

**(Defendant Swope)**

204.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

205.    This is an action brought against CCPD officer Defendant Swope in his individual

capacity, pursuant to 42 U.S.C. § 1983 and §  1988 in violation of the United States Constitution

Amendments IV and XIV.

206.    At all times material hereto, Defendant Swope was an employee and/or agent of

Defendant Chesterfield County, and acting within the course and scope of his employment with

same, and acting under color of law, to wit, under color of the statutes, ordinances, regulations,

policies, customs, and usages of Defendant Chesterfield County.

207.    Defendant Swope used excessive and objectively unreasonable force on the person

of November, depriving him of bodily integrity, life, liberty, and due process of law.

208.    To wit, CCPD officer Swope discharged his taser at November, as described above

in this Complaint despite, constructive and actual knowledge, among other things, that there was a

strong odor of gasoline at the scene, "a lot" of fuel was leaking from the vehicle, that November

was dragged from the overturned vehicle that was leaking gas, that November was dragged through

the crash site that was covered with fuel, that November was likely covered with gas, an/or that

there were sufficient gas and gas vapors in the area to cause a fire if a taser were used.  Defendant

Swope fired his taser gun without issuing any verbal commands to November and despite

knowing or having constructive knowledge that November was injured, was surrounded by four

heavily armed officers, that November was restrained, and that November had not left the

ground.  Even apart from the significant flammability concerns, there was no then-present

exigency that was sufficiently dangerous to justify the use of a taser.  Defendant Swope fired the

taser gun into November's back causing a fire ball to erupt. The use of force exhibited by Defendant Swope against November was objectively unreasonable and clearly excessive.

209. As a direct and proximate result of Defendant Swope's acts, omissions, and use of excessive force, Defendant Swope deprived November of the right to life and due process of law guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution, in particular, firing his taser at November, and causing significant injury.

210. As a direct and proximate result of Defendant Swope's acts, omissions, and use of excessive force, November has ongoing and continuous permanent damages and injuries, and as such is entitled to recovery, including but not limited to the following:

     a.     Compensation for severe bodily injury;

     b.     Past and future medical bills and expenses;

     c.     Pain and suffering;

     d.     Punitive damages;

     e.     Award of reasonable attorneys' fees and costs to Plaintiffs on Federal § 1983 Counts;

     f.     Any and all other and further relief as this Court may deem appropriate.

211. Wherefore, Plaintiffs demand and are entitled to recover judgment against the Defendant Swope for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00), plus the other forms of damages noted above, as well as pre- and post-judgment interest and costs.

**COUNT VII**

**EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983
AND AMENDMENTS IV AND XIV**

**(Defendants Gruarin, Colvin, Loving, and Wilson)**

212.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

213.    This is an action brought against CCPD officers Defendants Gruarin, Colvin, Loving, and Wilson in their individual capacities, pursuant to the United States Constitution Amendments IV and XIV, in violation of 42 U.S.C. § 1983 and §  1988.

214.    At all times material hereto, Defendants Gruarin, Colvin, Loving, and Wilson (for purposes of this Count only the foregoing are referred to as the "Foregoing Defendants") were employees and/or agents of Defendant Chesterfield County, and acting within the course and scope of their employment with same, and acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant Chesterfield County.

215.    The Foregoing Defendants participated in the application of excessive and objectively unreasonable force on the person of November, depriving him of bodily integrity, life, liberty, and due process of law. To wit, the Foregoing Defendants, with actual or constructive knowledge that November was covered in a highly flammable liquid that would be ignited by the use of a taser, and with actual or constructive knowledge that Swope was going to fire a taser at November, stepped away from November for the specific purpose of assisting Defendant Swope in the successful infliction of up to 50,000 volts of electricity to a human being covered by flammable liquid and/or vapors, and/or in the proximity thereof.

216.    Also, or alleged in the alternative, the Foregoing Defendants violated November's rights to bodily integrity, life, liberty, and due process of law by failing to take reasonable steps to prevent Swope from firing the taser at November.  To wit, the Foregoing Defendants knew or should have known that Swope was intending to take action that would violate November's constitutional rights, had a reasonable opportunity to intervene to prevent or at least interfere with this unconstitutional act, but yet did nothing.  Indeed, not only did the Foregoing

Defendants do nothing to prevent Swope from firing the taser, they actively assisted him by stepping away from November.

217.    As a direct and proximate result of the Foregoing Defendants' acts, omissions, and clear use of excessive force, the Foregoing Defendants deprived November of the right to life and due process of law guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution, in particular, shooting November, and causing significant injury.

218.    November has ongoing and continuous permanent damages and injuries, and as such is entitled to recovery, including but not limited to the following:

   a.      Compensation for severe bodily injury;

   b.      Past and future medical bills and expenses;

   c.      Pain and suffering;

   d.      Punitive damages;

   e.      Award reasonable attorneys' fees and costs to Plaintiffs based on Federal § 1983 Counts;

   f.      Any and all other and further relief as this Court may deem appropriate.

219.    Wherefore, Plaintiffs demand and are entitled to recover judgment against the Foregoing Defendants jointly and severally for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00), plus the other forms of damages noted above, as well as pre- and post-judgment interest and costs.

## COUNT VIII

**CUSTOM/POLICY/PATTERN OR PRACTICE OF USE OF EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983 AND AMENDMENTS IV AND XIV**

**(Defendants Chesterfield County and Dupuis (in his official capacity))**

220.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.  To the

extent that any assertion contained in the Complaint is inconsistent with or determined to be inconsistent with the assertions contained in Count VIII, and/or vice versa, the assertions are made in the alterative.

221.    This is an action brought against Defendants Chesterfield County and Dupuis (in his official capacity) pursuant to the United States Constitution Amendments IV and XIV in violation of 42 U.S.C. § 1983 and § 1988.

222.    Defendant Chesterfield County maintained an official policy that permitted and/or authorized the unconstitutional use of force that directly and proximately caused the violation of November's rights.   CCPD Operational Policy/Procedure 2-29, IV A. 5 states that tasers "should not be used in the known presence of vapors or liquids or other flammable substances."   However, 2-29 does not prohibit, and thus implicitly approves, the firing of a taser when an officer *suspects* that the firing will lead to the same dire consequences given the totality of circumstances.   Yet the United States Constitution requires officers that know *or* suspect that their actions will cause such harm to refrain from taking those actions.   Defendants further degrade any constitutional protection afforded by 2-29 by asserting that it is merely suggestive rather than mandatory.

223.    Defendant Swope suspected or had reason to suspect November was covered in a gasoline, and that flammable liquids or vapors were present at the scene.   However, according to Defendant Chesterfield County and its policy maker, Defendant Dupuis, Defendant Swope fired his taser fully in accordance with CCPD policy.   Defendant Swope's firing of his taser at November was in direct violation of the United States Constitution.   CCPD's policy thus was a legal cause of the violation of November's constitutional rights and the injuries that resulted therefrom.

224.    Defendant Chesterfield County also failed to sufficiently train its officers. To wit,

70

Defendant Dupuis, a policy maker for Chesterfield County, was deliberately indifferent to the rights of persons with whom Swope would come into contact.  Such deliberate indifference is evidenced by, among other things, the constitutional inadequacies of the taser use of force directive, and his awareness of faulty training practices as exemplified by the regular unchecked unconstitutional uses of tasers by CCPD officers, including the very high taser rate of five officers including Swope, as well as the tasing of subjects for no apparent reason, or who are: juveniles, unarmed mentally ill persons, handcuffed, on the ground in the custody of other officers, tasered multiple times oftentimes by multiple officers, and/or after circumstances had de-escalated and the subject was on the ground.  Despite having actual or constitutive knowledge of the foregoing, Defendant Dupuis did not take appropriate steps to properly train officers.  As a direct and proximate result of Dupuis' failure, November suffered constitutional injury.

225.    Defendant Chesterfield County also failed to properly supervise Defendant Swope.  To wit, Defendant Dupuis, a policy maker for Chesterfield County, had actual or constructive knowledge that Defendant Swope posed a pervasive and widespread risk of constitutional injury.  Swope had, among other things, refused to follow a superior's directive and exhibited unchecked, aggressive behavior.  Swope had a heated off-duty confrontation with a Richmond police officer where Swope had refused to follow the officer's directives, and had refused to leash his police dog after being ordered by a superior officer to do so, which resulted in an officer being attacked by the dog and suffering injuries.  Records also document that Defendant Swope tased suspects more frequently than almost all other officers in CCPD – a rate of approximately four times more frequently than most officers.  Also, at least two of Swope's tasing of subjects prior to his tasing of November appeared to be unconstitutional.  Swope's defiant, impulsive behavior, caused him to be an unfit, dangerous

officer.  Despite having actual or constructive knowledge, Defendant Dupuis did not take appropriate steps to properly supervise Defendant Swope.

226.    As a direct and proximate result of Defendant Chesterfield County's policy and/or Dupius's training failures and/or Dupuis supervisory failures, November has ongoing and continuous permanent damages and injuries, and as such is entitled to recovery, including but not limited to the following:

      a.      Compensation for severe bodily injury;

      b.      Past and future medical bills and expenses;

      c.      Pain and suffering;

      d.      Punitive damages;

      e.      Award of reasonable attorneys' fees and costs to Plaintiffs based on Federal § 1983 Counts;

      f.      Any and all other and further relief as this Court may deem appropriate.

227.    Wherefore, Plaintiffs demand and are entitled to recover judgment against the Foregoing Defendants jointly and severally for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00), plus the other forms of damages noted above, as well as pre- and post-judgment interest and costs.

## COUNT IX
### SUPERVISORY CLAIM FOR VIOLATION OF UNITED STATES CONSTITUTION
### (Defendants Dupuis and Lamb in their Individual/Supervisory Capacities)

228.    Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

229.    Defendants Dupuis and Lamb failed to properly supervise Defendant Swope. Defendant Dupuis, a policy maker for Chesterfield County, had very specific knowledge of Swope's departmental policy transgressions, and Defendant Lamb served as Defendant Swope's

supervisor on February 7-8, 2015 when Swope tased November, and at other times.  Both had

actual or constructive knowledge that Defendant Swope posed a pervasive and widespread risk

of constitutional injury.  Among other things, Defendants Dupuis and Lamb knew:

      a.     That Swope had regularly displayed defiant, impulsive, rash, hair-

triggered behavior, which was exemplified in the 2013 and 2014 events that led to discipline.

Specifically, in 2014, Swope was involved in two incidents which resulted in disciplinary

inquiries – one in which he got into a protracted, aggressive, heated argument with a City of

Richmond police officer near the Redskins training site in August of 2014.  In the incident,

Swope, off-duty at the time and in the City of Richmond, continually refused to comply with

instructions from the Richmond police officer.  In the other incident, Swope refused to obey an

order by a senior officer to leash his police dog at a canine training site, resulting in injuries to

another officer.

      b.     That Defendant Swope was one of the most prolific users of tasers in

CCPD.  Further, Swope had, on multiple occasions, deployed his taser in constitutionally

impermissible ways.

      (1)     Similar to the instant case, on August 10, 2014, Defendant Swope

tased a suspect who was on the ground in the custody of other officers.  Swope first deployed his

taser and Enedino Solorzano was taken to the ground by other officers.  Thereafter, while

Solorzano was on the ground and surrounded by other officers, Defendant Swope tased

Solorzano *again* because Solorzano allegedly continued resisting arrest.  Solorzano was

described as a Hispanic male, height 5'4'' to 5'6'', and *four* other officers besides Swope were

reportedly involved in the incident.

(2)     Less than two weeks later, on August 22, 2014 Defendant Swope tased Steven Whitesell, who is listed in the incident report as 5' 7" to 5' 9" tall, while multiple officers were present.  Whitesell allegedly resisted, allegedly tensing up to avoid re-handcuffing, and he allegedly made verbal threats towards the officers present.  Defendant Swope tased Whitesell after Whitesell allegedly continued to resist after receiving verbal warnings.  There were reportedly two other officers involved besides Swope, and a third officer who was an officer witness.  One undated record concerning the incident states, "Swope involved in this case.  **Flagged for Co. Atty.**"  (Emphasis in original).

230.     Defendant Dupuis acknowledged that Defendant Swope's fitness to serve was a material concern when in December 2014, Dupuis placed Swope on "disciplinary probation," which he characterized as a last-chance remedy.  Despite such concerns, Defendants Chesterfield County, Dupuis, and Lamb never imposed any measure to protect the public from Swope.  Despite having actual or constructive knowledge of Swope's dangerous proclivities, Defendants Dupuis and Lamb did not take appropriate steps to properly supervise Defendant Swope.

231.     As a direct and proximate result of Dupuis and Lamb's failures, November has ongoing and continuous permanent damages and injuries, and as such is entitled to recovery, including but not limited to the following:

a.     Compensation for severe bodily injury;

b.     Past and future medical bills and expenses;

c.     Pain and suffering;

d.     Punitive damages;

e.     Award of reasonable attorneys' fees and costs to Plaintiffs based on Federal § 1983 Counts;

   f.  Any and all other and further relief as this Court may deem appropriate.

232. Wherefore, Plaintiffs demand and are entitled to recover judgment against the Foregoing Defendants jointly and severally for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00), plus the other forms of damages noted above, as well as pre- and post-judgment interest and costs.

**COUNT X**

**BREACH OF DUTIES AND ASSUMED DUTIES**

**(Defendant Moss)**

233. Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

234. In or about early November 2014, CCPD hired, engaged, and consulted with Defendant Jon Moss, Ph.D., a police psychologist, to conduct the FFD exam on Defendant Swope and to report back his findings to CCPD as to whether Defendant Swope was fit for returning to duty as a patrol officer with CCPD.  Sometime in December 2014, despite Defendant Moss's actual or constructive knowledge that Defendant Swope ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████. Defendant Moss reported back to CCPD that Defendant Swope was fit for duty as a police officer.  Five weeks after Defendant Swope returned to active duty on the night shift, Defendant Swope acted improperly, hazardously, in haste, and with complete disregard to the safety of November and others in the area of gas fumes and spilled gasoline by deploying his taser and setting November on fire.

235. Defendant Moss holds himself out as a certified police psychologist, and as being qualified to conduct FFD exams for, and on behalf of, police departments in and around Chesterfield County.  CCPD contracted with or hired Defendant Moss on an independent

contractor basis to conduct Defendant Swope's FFD exam in order to determine whether

Defendant Swope was fit or should continue as an active duty police patrolman for the

Chesterfield County.  Under such an arrangement, CCPD, not Defendant Swope, is considered to

be the "client" of the examiner, and no physician-patient relationship exists between the

examiner (Moss) and the examinee (Swope).  In connection with Defendant Moss's FFD exam

of Defendant Swope, Moss had Swope sign a "Fitness-for-duty examination: disclosure

statement" containing the following paragraph:

> Who is the client in this evaluation?
> The client in this evaluation is the chief administrator of the agency.  Participation in this
> evaluation does not constitute a doctor patient relationship between you and Dr. Moss.
> Even though you are not the client, I still have ethical obligations to only provide
> information to your employer that is relevant to your fitness for duty.

236.    Because active duty police officers frequently come into contact with members of

the public and are called upon sometimes to make quick decisions under stressful conditions (and

because they are authorized to carry such deadly or injurious weapons as handguns and tasers),

police employers such as Chesterfield County have a legal duty to use due care to ensure that

police officers under their command are mentally and emotionally fit to perform their duties.  It

is reasonably foreseeable that a failure to have reasonable and adequate procedures, policies, and

methods in place (and to execute those procedures properly) to protect members of the public

and/or other officers from police officers who are not fit for duty can result in serious injury or

death to members of the public or arrestees, such as November, with whom the police officers

may foreseeably come in to contact.

237.    When it came to the attention of Defendant Swope's superiors during 2014 that

Defendant Swope was ███████████████████████████ which were impacting his

ability to carry out his duties, CCPD engaged Defendant Moss to conduct the examination or evaluation as to whether Defendant Swope was fit for duty.

238.    At all times relevant to this Complaint, Defendant Moss undertook to render services for consideration on behalf of or for CCPD to conduct the exam and perform services which he reasonably should have recognized as necessary for the protection of members of the public, fellow officers, and/or arrestees such as November, and to refrain from negligence or gross negligence in that regard, if:

a.    his failure to exercise due care increased the risk of such harm to November, or

b.    he undertook to perform a duty owed by CCPD toward November, or

c.    the harm was suffered because of reliance of CCPD upon the undertaking.

239.    Defendant Moss conducted the FFD exam of Defendant Swope for Chesterfield County, and thereby assumed and undertook the duty to conduct the examination or evaluation with reasonable care and had a duty to use that degree of skill and diligence in his evaluation, examination, and conclusions regarding Defendant Swope's fitness that a reasonably prudent psychologist or police psychologist or practitioner in the same field or practice or specialty in Virginia would have used under the circumstances of this case.

240.    In conducting the FFD exam, Defendant Moss had a duty to conduct appropriate tests, interviews, examinations, consultations, and review of medical and/or personnel records for Defendant Swope in order adequately and competently to explore whether Swope's mental and/or emotional state was likely to interfere with Defendant Swope's ability to perform the job of active duty police patrolman safely and effectively.

241.    Reasonable care on the part of Defendant Moss under the circumstances of this case required that he evaluate and investigate Defendant Swope's background and medical records and conduct testing or examinations of Defendant Swope in order to determine ███████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ that were or might be impacting his ability to sleep, concentrate, focus, and perform his job safely and effectively, and to follow up on indications known to Defendant Moss that Officer Swope was under-reporting the severity of his ████████████████████.

242.    In fact, as reported by Defendant Swope in workers' compensation claims and filings by Defendant Swope or counsel with regard to claims Defendant Swope made against Chesterfield County in 2015, Defendant Swope ███████████████████████████████████ ██████████████████ at the time Defendant Moss conducted the FFD exam in late 2014.  At or about that same time, Defendant Swope ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████.

243.    Defendant Swope's ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████ had been going on for two and a half years, or since some time in 2013.

244.    Before Officer Swope caused November to be engulfed in flames, and at all relevant times, Defendant Moss acted with negligence or gross negligence in breaching the duties stated above in multiple respects.  For example, without limitation:

a.    failing to follow up and use due care in examining, evaluating, and advising Chesterfield County regarding Defendant Swope's fitness for duty;

b.    failing to timely and completely inform Chesterfield County and/or Defendant Swope's superiors about Defendant Swope's fitness for duty;

c.    failing to fully, adequately and thoroughly examine Defendant Swope's ███████████████████████████████████████████████ which impaired Defendant Swope's ability to carry out his law enforcement duties in a reasonably safe and effective manner;

d.    failing to fully, adequately, and thoroughly examine available collateral information, including but not limited to Defendant Swope's employment records, his military service records, and observations of Swope's coworkers and family members;

e.    failing to conduct adequate, timely and reasonable psychological testing;

f.    failing to use reasonable care for a professional in his field of expertise in providing timely, sufficient, and accurate information to the Chesterfield County, the police department, or Officer Swope's superiors regarding Defendant Swope's fitness for duty; and

g.    failing to explore and take into account the 2013 incident in which Defendant Swope killed a citizen, and the 2014 incidents involving Redskins Park and failing to place his police dog on a leash.

245.    It was reasonably foreseeable to Defendant Moss and CCPD that Defendant Moss's failure to use due care to carry out his professional responsibilities regarding Defendant

Swope's FFD exam could and would expose members of the public (such as November) to unreasonable danger.  The population of those who would be exposed to this foreseeable and unreasonable danger was not universal, but rather was limited to those with whom Swope foreseeably would come in contact with in Chesterfield County in the course of his job duties as a CCPD police officer, including November.  This unreasonable danger would foreseeably be present in encounters with Defendant Swope, particularly in situations involving high stress in which Defendant Swope was called upon to use quick judgment in responding to sudden, fast moving and unpredictable situations on the job.

246.    The negligent and/or grossly negligent actions and omissions of Defendant Moss in failing to use due care and acting with gross negligence in carrying out the above described professional duties or assumed duties proximately caused, continue to cause, and will continue to cause November to suffer great injury and harm, including those injuries and damages previously alleged.

247.    Wherefore, Plaintiffs demand and is entitled to recover judgment against Defendant Moss for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00) plus interest from February 8, 2015 pursuant to § 8.01-382 of the Code of Virginia, (1950), as amended, and costs.

## COUNT XI
### BREACH OF CONSTITUTIONAL DUTY
#### (Defendant Moss)

248.     Plaintiffs incorporate by reference Paragraphs 1-167 of the Complaint.

249.     In or about early November 2014, CCPD and Dupuis set out to determine whether Defendant Swope was fit for duty.  Such a determination was part of CCPD and Dupuis'

continuing duty to supervise Defendant Swope and ensure that he did not present a pervasive and unreasonable risk of constitutional injury to members of the public.

250.    CCPD could have discharged this duty by hiring a full-time employee to perform fitness evaluations.  Instead, CCPD and Dupuis elected to discharge their constitutional duty by hiring Defendant Moss to determine Swope's fitness.  By knowingly assisting the "chief administrator of the agency" in the administrator's discharge of his constitutional duties, Moss acted under color of state law.

251.    As a state actor working with Dupuis to determine whether Swope presented a pervasive and unreasonable risk of constitutional injury to members of the public, Defendant Moss was required to obey the same constitutional edicts as Dupuis.  That is, if Moss knew or should have known that Swope presented a pervasive and unreasonable risk of constitutional injury to members of the public, but yet failed to take reasonable steps to mitigate that risk, Moss breached his duty under the United States Constitution.

252.    In or about November 2014, Defendant Moss evaluated Defendant Swope's fitness for duty.  In conducting his evaluation, Moss obtained actual or constructive knowledge that Defendant Swope had ███████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████ as described in detail above, would pose a pervasive and unreasonable risk of constitutional injury to members of the public.

253.    Although Defendant Moss knew or should have known of Swope's dangerous condition, and that such a condition placed the public at risk, Moss did not take any steps to prevent Swope from interacting with the public in his (Swope's) capacity as a policy officer.

254.     Moss's failure to properly assess Defendant Swope's condition, and/or his failure to take appropriate action limiting Swope's interaction with the public, were a proximate cause of Swope's use of excessive force on Plaintiff November.

255.     As a direct and proximate result of Defendant Moss's failures, November has ongoing and continuous permanent damages and injuries, and as such is entitled to recovery, including but not limited to the following:

    a.     Compensation for severe bodily injury;

    b.     Past and future medical bills and expenses;

    c.     Pain and suffering;

    d.     Punitive damages;

    e.     Award of reasonable attorneys' fees and costs to Plaintiffs based on Federal § 1983 Counts;

    f.     Any and all other and further relief as this Court may deem appropriate.

256.     Wherefore, Plaintiffs demand and are entitled to recover judgment against the Defendants Moss for compensatory damages in the sum of NINETY-FIVE MILLION and NO/100 DOLLARS ($95,000,000.00), plus the other forms of damages noted above, as well as pre- and post-judgment interest and costs.

**TRIAL BY JURY IS DEMANDED.**

MILES ZACKERY-COLE NOVEMBER, and

KIM POWELL, Guardian, Conservator,
and Attorney-in-Fact for and on behalf of
MILES ZACKERY-COLE NOVEMBER,


By: _____/s/ Mark J. Krudys_____
                        Counsel

John C. Shea (VSB #17436)
Mark S. Lindensmith (VSB #20452)
MARKS & HARRISON, PC
1500 Forest Avenue
Suite 100
Richmond, VA  23229
Phone (804) 282-0999
Facsimile (804) 288-1853
jshea@marksandharrison.com
mlindensmith@marksandharrison.com

Mark J. Krudys (VSB #30718)
THE KRUDYS LAW FIRM, PLC
919 East Main Street
Suite 2020
Richmond, VA  23219
Phone (804) 774-7950
Facsimile (804) 381-4458
mkrudys@krudys.com

*Counsel for Plaintiffs*

Charles H. Cuthbert, Jr. (VSB #14519)
Richard M. Cuthbert (VSB #82025)
CUTHBERT LAW OFFICES
A Professional Corporation
220 North Sycamore Street
Petersburg, VA 23803
Phone (804) 733-3100
Facsimile (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com